33 A.3d 949

MARYLAND INSURANCE COMMISSIONER

v.

CENTRAL ACCEPTANCE CORPORATION et al.

No. 7, Sept. Term, 2011.

Court of Appeals of Maryland.

Dec. 20, 2011.

**2**

4

**6**

Joshua N. Auerbach, Asst. Atty. Gen. (Douglas F. Gansler, Atty. Gen. of Maryland, and Lisa Boylan Hall, Asst. Atty. Gen., Baltimore, MD), on brief, for petitioner/cross-respondent.

Joseph A. Schwartz, III (J. Steven Wise of Schwartz, Metz & Wise, P.A., Baltimore, MD), on brief, for respondent/cross-petitioners.

Marta D. Harting (Venable, LLP, Baltimore, MD; Lee Steven Donner, Laurel, MD), on brief, for respondent/cross-petitioners.

Argued before BELL, C.J., HARRELL, BATTAGLIA, GREENE, ADKINS, BARBERA and JOHN C. ELDRIDGE (Retired, Specially Assigned), JJ.

HARRELL, J.

In 2008, Petitioner, the Maryland Insurance Commissioner ("Commissioner"), issued a Cease–and–Desist Order to Respondents purporting to prevent them from charging interest on loans to consumers to pay automobile insurance premiums in excess of the statutory maximum prescribed in Maryland Code (1957, 2011 Repl. Vol), Insurance Article, § 23–304. Respondents are eight of the largest premium finance companies[1] that provide loans primarily to customers of the Mary-

---

1. Respondents in this case are Agency Services, Inc., Central Acceptance Company, Inc., H & S Finance Company, Inc., Insurance Billing

land Automobile Insurance Fund ("MAIF"). Respondents requested a hearing on the Cease–and–Desist Order. Respondents requested twice that the case be transferred to the Office of Administrative Hearings ("OAH") for hearing and final decision, but the Commissioner denied the requests. Instead, the Commissioner delegated hearing authority to an Associate Deputy Insurance Commissioner ("ADIC"), who presided over the hearing at the Maryland Insurance Administration ("MIA"), and issued a Final Order affirming the Commissioner's Cease–and–Desist Order. Respondents brought a successful judicial review action in the Circuit Court for Baltimore City. The Court of Special Appeals affirmed, agreeing with the Circuit Court's reasoning that actual "command influence," represented by the Commissioner's delegation of the hearing and final administrative decision-making responsibility to a subordinate, tainted impermissibly Respondents' right to a fair hearing. We resolve, however, that the MIA hearing was fair and without undue "command influence." Therefore, we vacate the judgment of the Court of Special Appeals and direct it to vacate the judgment of the Circuit Court. Further, we conclude that the Commissioner's interpretation of Ins. Art., § 23–304 is correct, and that Respondents violated the statute when their premium finance agreements operated to assess a finance charge in excess of 1.15% for each 30 days. We conclude also that two Respondents were assessing improperly finance charges to customers whose underlying insurance policies were voided *ab initio,* because they charged more than 1.15% for each 30 days; however, lawfully applied finance charges on the premiums advanced for these policies before the policies were declared void, may be valid. Accordingly, we shall direct that the Court of Special Appeals direct the Circuit Court for Baltimore City to affirm for the most part, and reverse in small part, the decision of the MIA.

---

Services, Inc., Premium Finance of America, Inc., Senate Acceptance Corp., Inc., U.S. Capital Associates, and Crown Premium Funding Company.

## I. Facts and Antecedent Administrative and Judicial Proceedings

The material facts in this case are undisputed. The MAIF is the insurer of last resort for Maryland drivers, where automobile insurance is required statutorily for all motor vehicle owners. Maryland Code (1957, 2011 Repl.Vol.), Transp. Art., § 17–103 & Ins. Art., § 20–301(a). The MAIF is prohibited by statute from accepting installment payments on insurance premiums. Ins. Art., § 20–507(f)(ii). Premium finance companies ("PFCs") provide loans, through premium finance agreements, to the MAIF's customers who are unable to pay the premium in a lump sum.[2] PFCs must register with the MIA before making loans to the MAIF's insurance customers, and must meet certain financial requirements. Ins. Art., §§ 23–201(a) & 23–202. The Premium Financing Article of the Insurance Article of the Maryland Code regulates the interest, fees, and charges that PFCs may collect from consumers.[3] The provision primarily at issue in this case is Ins. Art., § 23–304, which addresses finance charges:

The finance charge shall be computed:

(1) on the amount of the entire premium loan advanced, including any taxes or fees that are financed under § 23–

---

**2.** A premium finance company is "a person that engages in the business of entering into or accepting premium finance agreements." Maryland Code (1957, 2011 Repl.Vol.), Ins. Art., § 23–101(c). A premium finance agreement is an agreement

(i) by which an insured or prospective insured promises to pay a premium finance company the amount advanced or to be advanced under the agreement, together with the interest and service fee, to an insurer or an insurance producer in payment of premiums; and (ii) that contains an assignment of or is otherwise secured by the unearned premium or refund obtainable from the insurer on cancellation of the insurance contract.

Ins. Art., § 23–101(b).

**3.** The Insurance Article regulates the initial service fee (not to exceed $20), a delinquency fee (up to a maximum of 5% of the installment in default), a cancellation charge (variable), an electronic payment fee (up to $8 for actual expenses), and a dishonored check fee (not to exceed $25). Ins. Art., §§ 23–305 to 23–308. No person may impose greater charges than those enumerated specifically by Ins. Art. § 23. Ins. Art., § 23–504.

301.1 of this subtitle, after subtracting any down payment on the premium loan made be the insured;

(2) from the inception date of the insurance contract or from the due date of the premium, disregarding any grace period or credit allowed for payment of the premium, through the date when the final installment under the premium finance agreement is payable; and

(3) at a rate not exceeding 1.15% for each 30 days, charged in advance.

Premium finance agreements may be cancelled, in the event of an installment payment default as specified in the contract, provided the implicated PFC provides the customer with a notice of intent to cancel at least 10 days prior to cancelling the contract. Ins. Art., §§ 23–402(a) & 23–403. When an insurance contract is canceled—whether by the insurer, insured, or the PFC—the MAIF returns the gross unearned premiums due under the contract, computed pro rata, to the PFC. Ins. Art., § 23–405(a). The PFC then returns "to the insured the amount of unearned premium that exceeds any amount due under the premium finance agreement." Ins. Art., § 23–405(b).

Respondents use the Rule of 78s (sometimes referred to as the "Rule") to calculate the amount of interest due with each installment under the premium finance agreement. The Rule of 78s is an arithmetic method to calculate earned interest that allows the PFCs to collect more in interest during the first half of the loan repayment term than the latter half.[4] Respon-

---

4. The Rule of 78s is

> when a loan is to be repaid in monthly installments, each month of the loan's term is assigned a digit, with the first month's digit [equaling] the total number of months in the agreed period of the loan. The second month is then assigned a digit one less than that of the first, the third month again one less, and so on, until the digit assigned to the last month equals (1) one. For a twelve month loan, the sum of the digits (12 + 11 + 10 ... + 1) of this arithmetic progression is 78. This number then serves as the denominator in a fractional equation, with the numerator being the sum of the digits for those months expired at the time of the obligation's prepayment. For example, assuming a twelve month loan obligation, if the entire

dents require typically ten-month repayment plans, so the Rule is modified to a "Rule of 55s" in such instances. The Rule is not prohibited specifically by the Insurance Article.

When a premium finance agreement is cancelled early, the Rule operates to the disadvantage of consumers because the interest charges are weighted more heavily in the early months of the contract repayment period.[5] Two of the Respondents, Insurance Billing Services and U.S. Capital Associates, assess finance charges using the Rule, even when the underlying insurance policy is cancelled or voided *ab initio*.[6] The MIA did not disapprove previously the use of the Rule by the PFCs and, in fact, states currently that the Rule is allowed for computing finance charges, so long as its use does not result in the consumer being required to pay more than 1.15% interest for any 30–day period.

In May 2008, the predecessor Commissioner of the current Commissioner commenced an investigation into the earned

---

loan were prepaid at the end of the first month, 12/78 of the total finance charge would be retained by the creditor. This represents a greater proportion of the finance charge than in any other month because the borrower has had the use of the entire amount of the loan for that month. At the end of the second month, 11/78 of the finance charge would be retained since the borrower has had the use of 11/12, or most of the loan proceeds for that month. If the borrower prepaid the entire obligation at this time, 23/78 of the finance charge would be considered to have been earned and therefore would be retained by the creditor. At the end of six months, the creditor would be entitled to 57/78 of the total finance charge, and the consumer in turn to 21/78 of such charge.
*Bone v. Hibernia Bank*, 493 F.2d 135, 137 (9th Cir.1974).

5. For example, on a $1000 premium finance agreement, the total finance charges for 10 months would be $115.00. Using the Rule of 78s, the PFC would collect interest payments of $20.91 the first month, $18.82 the second month,$16.73 the third month, and $14.64 the fourth month. This is a total interest charge of $71.10 if the policy were cancelled after four months and represents over 61% of the total interest for the policy. Under the MIA's method, equal monthly interest charges of $11.50 would be due. This would be a total interest charge of $46.00.

6. *Ab initio* means "[f]rom the beginning." Black's Law Dictionary 5 (9th ed.2009).

interest calculations used by the PFCs from 1 November 2007 to 30 April 2008. In a 19 May 2008 letter, the predecessor Commissioner requested specific documents from Respondents in order to compile a "Market Conduct Investigation Report." The investigation revealed that, because of how the PFCs used the Rule, consumers who cancelled their premium finance agreements in the first five months, or whose insurance policies were declared void *ab initio*, paid finance charges greater than 1.15% for each 30 days that the loan was outstanding. The predecessor Commissioner issued a Cease–and–Desist Order on 6 October 2008 that prevented Respondents from collecting interest in excess of 1.15% for each 30–day period on any and all premium finance agreements, including those canceled before maturity. The Cease–and–Desist Order required also that Insurance Billing Services and U.S. Capital Associates identify customers who paid interest on insurance policies voided *ab initio* by the MAIF and for these PFC's to refund all interest charged and pay pre-judgment interest of six percent to those consumers.

Respondents requested timely a hearing on the Commissioner's Cease–and–Desist Order. The request resulted in a stay of the Order, by operation of statute. Ins. Art., § 2–212 (providing that a hearing demand made within ten days of an order of the Commissioner stays the effect of the order until the result of the hearing is set forth in another order). The Commissioner delegated to an ADIC the responsibility to conduct the hearing and make the final administrative decision. Respondents requested twice that the hearing be transferred to and conducted by the OAH, arguing that the ADIC could not be a fair and impartial presiding official with respect to the Cease–and–Desist Order issued by the Commissioner, the ADIC's hierarchical superior. The Commissioner denied both requests.[7] The ADIC's hearing took place over 9 December 2008 to 11 December 2008. Respondents subpoenaed the Commissioner to attend the hearing, but he testified

7. The Commissioner is authorized expressly to delegate hearing authority to an associate deputy commissioner. Ins. Art., § 2–210(d).

actually as a witness for the MIA. In that testimony, the Commissioner explained his rationale supporting the investigatory conclusions and the basis for the Cease–and–Desist Order. Respondents attempted to show that the Commissioner ratified previously the use of the Rule by, among other things (*see* n. 15 *infra,* introducing evidence that the MIA proposed twice, but withdrew, regulations that had the same effect as the Cease–and–Desist Order (to force PFCs to charge interest pro rata, rather than according to the Rule)).

On 22 January 2009, the ADIC issued a Final Order affirming the conclusions of law and directions in the Commissioner's Cease–and–Desist Order. The Final Order concluded that Respondents were not entitled to have their administrative appeal transferred to the OAH because the Insurance Article allowed specifically the Commissioner to delegate the role of hearing officer and that delegation to the OAH was purely discretionary. The Final Order required Insurance Billing Services and U.S. Capital Associates to identify customers who paid a finance charge on underlying policies found to be void *ab initio,* from and after 6 October 2008 (the date of the Cease–and–Desist Order), and issue refunds to those customers, with pre-judgment interest. The ADIC also found that the Commissioner's Cease–and–Desist Order was within his statutorily-conferred powers in Ins. Art., § 2–108 and that he was not required to act, under the circumstances, by issuing a regulation, rather than an ad hoc decision.

Respondents filed a petition for judicial review in the Circuit Court for Baltimore City. The hearing judge, relying on *Mayer v. Montgomery County,* 143 Md.App. 261, 794 A.2d 704 (2002), found "command influence" because the ADIC adjudicated the conclusions of her superior, the Commissioner; therefore, the administrative hearing violated Respondents' right to fundamental fairness and due process of law. The hearing judge declined to address the issue of the statutory interpretation regarding the application of the finance rate "cap" and ordered the case remanded to the MIA with instructions to provide Respondents with a hearing on the Commissioner's Cease–and–Desist Order before an impartial hearing

officer. On the Commissioner's appeal, the Court of Special Appeals, in an unreported opinion, affirmed the Circuit Court's judgment. Petitioner filed timely a petition for writ of certiorari to this Court and Respondent, Premium Finance of America, Inc., filed timely a cross-petition. We granted the petition and the cross-petition, *Maryland Insurance Commissioner v. Central Acceptance Corporation*, 418 Md. 586, 16 A.3d 977 (2011), to consider the following questions, which we reword somewhat for clarity:

1) Did the agency determine correctly that § 23–304 of the Insurance Article, which permits premium finance lenders to impose on borrowers a finance charge "at a rate not exceeding 1.15% for each 30 days, charged in advance," prohibits (a) the practice of front-loading the imposition of finance charges, such that borrowers whose loan agreements terminate prior to the end of the loan term pay finance charges in excess of 1.15% for each 30 days, and (b) the practice of imposing finance charges even where the insurance policy never takes effect?

2) Does the "command influence" rule prohibit, as a matter of constitutional due process, an administrative agency from adjudicating a matter after it has issued a pre-hearing ex parte order in the matter?

3) Does the "command influence" rule apply to a regulatory proceeding where all material facts were undisputed, where the agency was deciding a pure question of law, and where the agency's legal ruling was subject to judicial review?

4) Is the Commissioners Cease–and–Desist Order contrary to law because it implements a change in generally applicable policy that may be implemented only through the adoption of regulations, not adjudication?

5) Is the Commissioner's Cease–and–Desist Order contrary to law because the Cease–and–Desist Order was issued without complying with the procedural requirements of §§ 2–209 and 23–207 of the Insurance Article, the sections cited in the Cease–and–Desist Order as the authority under which the Order was issued?

6) Is the Commissioners Cease–and–Desist Order contrary to law because the MIA lack the statutory authority to issue cease-and-desist orders against premium finance companies?

We hold that: (1) based on the facts and circumstances of this case, there was no undue "command influence" exercised by the Commissioner in delegating to the ADIC the responsibilities to hear and decide Respondents' administrative appeal; (2) the MIA was permitted to adjudicate the legal issues in this case, rather than proceed by rulemaking; (3) the Commissioner had the statutory authority to issue the Cease–and–Desist Order; (4) any alleged procedural irregularities did not affect a substantial right of Respondents; (5) the MIA interpreted correctly Ins. Art., § 23–304 with respect to calculating the maximum finance charges; and (6) the PFCs may charge the lawful rate of interest on premiums advanced for insurance policies later voided *ab initio*. Accordingly, we vacate the judgment of the Court of Special Appeals and remand the case to that court with directions to vacate the judgment of the Circuit Court and to remand the case to the Circuit Court with directions to affirm in part, and reverse in part, the MIA's Final Order, consistent with the views expressed in this Court's opinion.

## II. Standards of Review

In cases involving judicial review of actions by a State administrative agency, we review directly the action of the agency, rather than the decision of the intervening reviewing courts. *Consumer Prot. Div. v. Morgan*, 387 Md. 125, 160, 874 A.2d 919, 939 (2005) (citation omitted). In a proceeding reviewing a contested case action, a reviewing court may:

(1) remand the case for further proceedings;

(2) affirm the final decision; or

(3) reverse or modify the decision if any substantial right of the petitioner may have been prejudiced because a finding, conclusion, or decision:

(i) is unconstitutional;

(ii) exceeds the statutory authority or jurisdiction of the final decisionmaker;

(iii) results from an unlawful procedure;

(iv) is affected by any other error of law;

(v) is unsupported by competent, material, and substantial evidence in light of the entire record as submitted; or

(vi) is arbitrary and capricious.

Maryland Code (1957, 2009 Repl.Vol.), State Government Article, § 10–222. We evaluate generally a challenge to an agency's decision to proceed by adjudication rather than rulemaking under the abuse of discretion standard. *Consumer Prot. Div. v. Consumer Publ'g Co.*, 304 Md. 731, 753–54, 501 A.2d 48, 60 (1985) ("[T]he choice between rulemaking and adjudication lies . . . within the [agency's] discretion.") (citations omitted). This deferential standard of review is also applied to an agency's decision whether to delegate a case for adjudication to the OAH. *Spencer v. Md. State Bd. of Pharmacy*, 380 Md. 515, 529, 846 A.2d 341, 349 (2004) ("[T]he discretionary functions of the agency must be reviewed under a standard more deferential than either the *de novo* review afforded an agency's legal conclusions or the substantial evidence review afforded an agency's factual findings."). Abuse of discretion review evaluates whether an agency's action was arbitrary and capricious. *Id.* ("[T]he standard set forth in § 10–222(h)(3)(vi), review of "arbitrary and capricious" agency actions, provides guidance for the courts as they seek to apply the correct standard of review to discretionary functions of the agency.").

When reviewing an agency's departure from its procedures, the court looks to whether a "substantial right" of a party was violated and whether that party was prejudiced by the procedural irregularities. *Pollock v. Patuxent Inst. Bd. of Rev.*, 374 Md. 463, 469 n. 3, 823 A.2d 626, 630 n. 3 (2003) (citing *Bernstein v. Real Estate Comm'n of Md.*, 221 Md. 221, 230, 156 A.2d, 657, 662 (1959)), *appeal dismissed,* 363 U.S. 419, 80 S.Ct. 1257, 4 L.Ed.2d 1515 (1960) (stating that the function of a reviewing court is to reverse or modify and order if

"substantial rights of a petitioner have been improperly preju-
diced by a departure from procedures").

 When considering a question of statutory interpreta-
tion by an agency, we review the agency's interpretation
according to a non-deferential standard of review. *Miller v.
Comptroller of Md.*, 398 Md. 272, 280, 920 A.2d 467, 472 (2007)
("[T]he question is one of statutory interpretation and [is],
therefore, a purely legal inquiry.") (internal quotes and cita-
tions omitted); *State Dep't of Assessments and Tax'n v. N.
Balt. Ctr., Inc.*, 129 Md.App. 588, 595, 743 A.2d 759, 763 (2000)
("The interpretation of a statute normally presents a question
of law.") (citations omitted). Nonetheless, we give frequently
"weight to an agency's experience in interpretation of a stat-
ute that it administers," *Schwartz v. Md. Department of
Natural Resources*, 385 Md. 534, 554, 870 A.2d 168, 180 (2005),
especially when that statute is ambiguous or unclear. *Div. of
Labor & Indus. v. Triangle Gen. Contrs., Inc.*, 366 Md. 407,
417, 784 A.2d 534, 539–40 (2001). On the other hand, when
the language of the statute is clear and unambiguous, no
deference is due the administrative interpretation. *Id.*

### III. Discussion

### A. "Command Influence"

 Respondents' threshold claim, and the only one decided
by the earlier reviewing courts, is that the MIA's hearing on
the Commissioner's Cease–and–Desist Order was contrary to
the Court of Special Appeal's discussion of Maryland law in its
opinion in *Mayer*. In *Mayer*, a police sergeant filed an
administrative grievance challenging the results of a pro-
motional examination resulting in his classification as "quali-
fied," rather than "well qualified" as required for promotion to
lieutenant. *Mayer*, 143 Md.App. at 264–65, 794 A.2d at 706–
07. The basis for Mayer's grievance was that the raters who
evaluated his performance were incompetent or otherwise
unqualified to judge him on specific areas of proficiency.
*Mayer*, 143 Md.App. at 267, 794 A.2d at 708. The County
Director of the Office of Human Resources ("OHR") denied

Mayer's grievance in a written "Step II" response (according to the County Administrative Procedures), and Mayer appealed that decision by requesting a "Step III" hearing. *Mayer*, 143 Md.App. at 267–68, 794 A.2d at 708. The hearing officer assigned to Mayer's Step III appeal was the subordinate of the County Director who denied Mayer's grievance at the Step II level. *Mayer*, 143 Md.App. at 268, 794 A.2d at 708. Mayer objected to the hearing officer's appointment, arguing that a subordinate of the Director would be under "command influence" and "loath to render a decision adverse to that of her superior and therefore would not be impartial, or at least would not appear to be impartial." *Id.* The Step III hearing officer affirmed the Step II written denial of Mayer's grievance. *Id.* Mayer appealed the Step III hearing to the Board of Appeals, which affirmed the OHR's actions, and then to the Circuit Court for Montgomery County, which also affirmed. *Mayer*, 143 Md.App. at 269–70, 794 A.2d at 709–10. The Court of Special Appeals reversed, concluding that "there is a substantial likelihood that the hearing officer's view of the case will be tainted and that he therefore will not render an impartial decision; and if there is no actual partiality, the process appears not to be impartial." *Mayer*, 143 Md.App. at 277, 794 A.2d at 714. In reaching that conclusion, the Court of Special Appeals noted as significant that "the Step II responder and the Step III hearing officer engaged in nearly an identical adjudicatory-type function." *Mayer*, 143 Md.App. at 280, 794 A.2d at 715. In this case, the intermediate appellate court distinguished the facts in *Mayer* from those in our opinions in *Spencer* and *Consumer Publishing*, where we held that a combination of adjudicative and investigative functions within an agency was permissible.

Respondents maintain their view that the ADIC was under the "command influence" of the Commissioner, who initiated the original investigation and issued the Cease–and–Desist Order; therefore, the hearing on the administrative appeal was unfair, or gave the appearance of being unfair. The MIA counters that the Commissioner was authorized by the Insurance Article expressly to delegate the hearing to an ADIC and

that a theory of "command influence" does not apply to hearings where the material facts are not in dispute and the ADIC was called upon to decide questions of law solely. We agree with the MIA that a theory of "command influence" does not apply to the facts of the present case and the delegation of the hearing and final decision-making to the ADIC was proper.

The due process concerns expressed by the Court of Special Appeals in *Mayer* were generated by a very specific factual and procedural scenario not analogous to the circumstances in the instant case. Unlike *Mayer*, the ADIC's hearing was not an "identical adjudicatory-type function" to what the Commissioner engaged in leading to the issuance of the Cease–and–Desist Order. The Commissioner initiated the "market conduct investigation" into the PFCs' finance practices and, upon concluding the report of the investigation, issued the Cease–and–Desist Order. The Commissioner's actions were ex parte in large part Respondents' demand for a hearing as to the Cease–and–Desist Order initiated the administrative adjudicatory process contemplated by the regulatory scheme. The ADIC's hearing was a contested case hearing with "trial type procedures," including pre-trial notice, evidence, privileges, cross-examination, and burdens of proof. Maryland Code (1957, 2009 Repl.Vol.) State Gov't Art., §§ 10–208, 10–213, 10–217. The fact-finding investigation and Cease–and–Desist Order engaged in by the Commissioner were not an "identical" function to the contested case hearing held by the ADIC; therefore, the predicate facts and procedures in *Mayer* are distinguishable from those in the present case.

Moreover, *Mayer* involved a hearing officer who was obliged to resolve disputed questions of fact. Here, the ADIC was called upon to decide only questions of law.[8] Respondents

---

8. Petitioner and Respondents entered into a Joint Stipulation as to Document Review before the MIA hearing, which amounted to an agreement to the material facts of the present case. In their briefs to us, however, Respondents appear to retreat from the agreed upon facts, especially as to the MIA's supposed past implied approvals of the use of the Rule; however, the MIA does not contest that it approved the use of

argue that this is a distinction without significance; we do not agree. As recognized by the Court of Special Appeals in *Mayer*, judicial review of an agency action on a question of law engages a generally non-deferential standard of review. 143 Md.App. at 271, 794 A.2d at 710 ("In contrast to the deferential review accorded to an agency's factual findings, questions of law receive no deference on review; we are not bound by the agency's interpretation of law.") (citing *Caucus Distribs. v. Md. Sec. Comm'r*, 320 Md. 313, 324, 577 A.2d 783, 788 (1990)). Judicial review of agency fact-finding, on the other hand, is given significant deference. *Milliman, Inc. v. Md. State Ret. Pension Sys.*, 421 Md. 130, 152, 25 A.3d 988, 1001 (2011) ("[A] reviewing court must defer to the agency's fact-finding and drawing of inferences if they are supported by the record.") (quoting *Motor Vehicle Admin. v. Shea*, 415 Md. 1, 14, 997 A.2d 768, 775–76 (2010)) (internal quotations omitted). Were the ADIC subject to the Commissioner's "command influence," and Respondents have not shown that she was, judicial review would cure any errors of law.[9]

Respondents requested twice that the Commissioner transfer the administrative appeal to the OAH for hearing and decision, and twice the Commissioner denied that request. Under the State Administrative Procedures Act ("APA"), the decision to delegate a case to the OAH for hearing and a proposed or final administrative decision lies solely within the discretion of the agency, although the particular facts of a given case may compel a specific choice if fundamental fair-

the Rule and, in fact, continues to approve of the Rule in certain cases. Although it may be, with the benefit of hindsight, that Respondents' wish now to call upon divergent inferences drawn from the agreed-upon facts in this case, that does not mean that the ADIC was deciding issues other than largely questions of law as a result of the administrative hearing.

**9.** Respondents offer as the only indicia of "command influence" that the Commissioner's legal advisor sat beside the ADIC throughout the hearing and that the Commissioner testified as a witness; therefore, the Commissioner must have influenced the ADIC's decision, or it appeared to be so.

ness demands. State Gov't Art., § 10–205(a).[10] For example, in *Spencer,* several members of the Board of Pharmacy, having been involved in failed settlement negotiations with Spencer, refused to recuse themselves from the hearing on the merits that ensued. 380 Md. at 520–22, 846 A.2d at 343–45. Spencer requested that the hearing be transferred to the OAH, was denied, and, on judicial review, argued that the refusal to transfer her case was a violation of due process. *Spencer,* 380 Md. at 524, 846 A.2d at 346. We held that the decision whether to transfer a case to the OAH was within the agency's discretion, and would be reviewed under the "arbitrary and capricious" standard. *Spencer,* 380 Md. at 531, 846 A.2d at 350. ("[A]n agency's prerogative with respect to case referral to OAH is similar in scope to that of the prerogative in determining the severity of sanctions, or to that of forgoing prosecution of a particular individual."). Even though the members of the Board in *Spencer* erred in not recusing themselves from hearing Spencer's matter, we concluded that this error alone was not so egregious a problem that it could not be cured on remand by anything other than a delegation to the OAH to hold a new hearing. 380 Md. at 527, 846 A.2d at 344–49.

In the present case, there has been no showing of "fraud or egregious behavior on behalf of the agency" that would persuade us that the Commissioner, the ADIC, or the MIA acted arbitrarily or capriciously. *Spencer,* 380 Md. at 533, 846 A.2d at 352. The Commissioner was authorized by the State APA either to hold a hearing *or* delegate all or part of the hearing

---

**10.** Maryland Code (1957, 2009 Repl.Vol.) State Gov't Art., § 10–205(a) provides,

(a) *To whom delegated; limitation.*—(1) Except as provided in paragraph (2) of this subsection, a board, commission, or agency head authorized to conduct a contested case hearing shall:

(i) conduct the hearing; or

(ii) delegate the authority to conduct the contested case hearing to:

1. the Office [of Administrative Hearings]; or

2. With the prior written approval of the Chief Administrative Law Judge, a person not employed by the Office.

. . .

and decision-making responsibilities to the OAH. State Gov't Art., § 10–205(a). The Commissioner was authorized, also by statute, to delegate internally the hearing and decision-making responsibilities to the ADIC. Ins. Art., § 2–210(d). The Commissioner initiated an investigation and issued a Cease–and–Desist Order based on his findings. Although the Commissioner did participate in the resultant hearing as a witness, he was questioned by both the MIA and Respondents about his reasons for issuing the Cease–and–Desist Order; his view of, and the alleged former position of the MIA, on the use of the Rule; his role in the MIA's relevant legislative advocacy; and his view on the practice regarding premium refunds on policies voided *ab initio*. The transcripts of the MIA hearing do not indicate any episodic or systemic impropriety on the part of the Commissioner or the ADIC.

Respondents argue that the influence of the Commissioner was entwined impermissibly with the ADIC's conduct of the hearing. Section 2–209 of the Insurance Article allows specifically the Commissioner to "testify and offer other proper evidence about [the] information obtained during an examination." Ins. Art., § 2–209(d)(1), (d)(2). Notwithstanding that the ADIC was appointed by the Commissioner, without some additional evidence, we shall not assume that the ADIC, who is authorized to preside over hearings at the MIA, is unable to resist "command influence" in any given case and, therefore, unable to provide a fair hearing to Respondents.

Respondents maintain that they were not afforded a fair hearing because it is improper generally for an agency to conduct a hearing after the agency head issues an ex parte order. We, as well as our intermediate appellate court brethren, have held in numerous cases that the combination of adjudicatory and investigatory functions in an agency is not, per se, a violation of due process. *Consumer Publ'g Co.,* 304 Md. at 763, 501 A.2d at 64–65; *Morgan,* 387 Md. at 194, 874 A.2d at 959–60; *State Bd. of Physicians v. Bernstein,* 167 Md.App. 714, 894 A.2d 621 (2006); *Rosov v. Md. State Bd. of Dental Exam'rs,* 163 Md.App. 98, 877 A.2d 1111 (2005). These cases relied on the U.S. Supreme Court's decision in

*Withrow v. Larkin,* 421 U.S. 35, 95 S.Ct. 1456, 43 L.Ed.2d 712 (1975). In *Withrow,* a physician argued that a state board violated his due process when the board conducted a hearing on charges it investigated before authorizing the bringing of charges. 421 U.S. at 40, 95 S.Ct. at 1461, 43 L.Ed.2d at 720. The U.S. Supreme Court rejected the physician's argument, reasoning that:

[t]he contention that the combination of investigative and adjudicative function necessarily creates an unconstitutional risk of bias in an administrative adjudication ... must overcome a presumption of honesty and integrity in those serving as adjudicators; and it must convince that, under a realistic appraisal of psychological tendencies and human weakness, conferring investigative and adjudicative powers on the same individuals poses such a risk of actual bias or prejudgment that the practice must be forbidden if the guarantee of due process is to be adequately implemented.

421 U.S. at 47, 95 S.Ct. at 1464, 43 L.Ed.2d at 723–24. Further, the Court found that "[i]t is also very typical for the members of administrative agencies to receive the results of investigations, to approve the filing of charges or formal complaints instituting enforcement proceedings, and then to participate in the ensuing hearings." *Withrow,* 421 U.S. at 56, 95 S.Ct. at 1469, 43 L.Ed.2d at 729. The Court held that the combination of adjudicatory and investigatory functions does not violate due process. *Id.* The Court left open, however, the possibility that, in special circumstances, the combination of functions may present a "risk of unfairness [that] is intolerably high." *Withrow,* 421 U.S. at 58, 95 S.Ct. at 1470, 43 L.Ed.2d at 730.

In *Consumer Publishing,* we upheld the Consumer Protection Division's investigation, filing of charges, and adjudication of allegedly deceptive advertising of "diet pills" in Maryland newspapers. 304 Md. at 737, 501 A.2d at 51–52. The statutory enumeration of the express and implied powers of the Consumer Protection Division included: receiving and investigating consumer complaints; investigating possibly unfair or deceptive trade practices; seeking a temporary or permanent

injunction; and exercising and performing "any other function, power and duty appropriate to protect and promote the welfare of consumers." *Consumer Publ'g*, 304 Md. at 745, 501 A.2d at 55. We concluded that the Consumer Protection Division's actions did not exceed the tolerance of *Withrow* because the Consumer Protection Division of the Office of the Attorney General received the results of the investigation and approved the filing of charges, but did not officiate at the hearing. *Consumer Publ'g*, 304 Md. at 763, 501 A.2d at 64–65. Rather, a law school professor was appointed by the Chief of the Consumer Protection Division (to whom the Attorney General delegated the responsibility) to sit as a special hearing officer, pursuant to then-existing statutory authority. *Consumer Publ'g*, 304 Md. at 769, 501 A.2d at 68. Conversely, the hearing officer did not participate in the investigation; therefore, there was no evidence of impropriety violative of due process. *Consumer Publ'g*, 304 Md. at 763, 501 A.2d at 64–65.

*Consumer Publishing* also alleged irregularity because the Attorney General of Maryland issued a press release on the same day the charges were filed, thereby supplying evidence that the Attorney General "prejudged" the merits of the case. *Consumer Publ'g*, 304 Md. at 764, 501 A.2d at 65. Unimpressed, we found the issuance of the press release, concurrent with issuing charges, did not violate due process. *Id.* (citing *Roberts v. Morton*, 549 F.2d 158, 164 (10th Cir.1976)), *cert. denied*, 434 U.S. 834, 98 S.Ct. 121, 54 L.Ed.2d 95 (1977). Even had the press release revealed that the Attorney General somehow "prejudged" the case, that alone did not rise necessarily to the level of a due process violation. *Consumer Publ'g*, 304 Md. at 766, 501 A.2d at 66 (citing *Shaughnessy v. United States*, 349 U.S. 280, 75 S.Ct. 746, 99 L.Ed. 1074 (1955)). Bias that rises to the level of a due process violation required "[s]tatements on the merits by those who must make factual determination on contested fact issues ... where fact finding is critical." *Id.* (citing *Staton v. Mayes*, 552 F.2d 908, 914 (10th Cir.1977)), *cert. denied*, 434 U.S. 907, 98 S.Ct. 309, 54 L.Ed.2d 195 (1977).

In *Morgan*, the Consumer Protection Division's investigation into, and hearing on charges of, improper home appraisals, passed muster when we found circumstances similar to those in *Consumer Publishing*. 387 Md. at 195, 874 A.2d at 960. Morgan did not meet the *Withrow* burden that a party alleging a violation of due process "must overcome a presumption of honesty and integrity in those serving as adjudicators." *Id.* In *Morgan*, there was no evidence or allegations of any facts or circumstances presenting an elevated risk of unfairness Morgan's argument rested instead on the per se invalidity of the Consumer Protection Division's general internal procedures for investigating, prosecuting, and adjudicating cases. *Id.*

■ The present case falls squarely within the core reasoning of *Consumer Publishing*, *Morgan*, and *Withrow*. We proceed from the presumption that the ADIC conducted the MIA hearing with honesty and integrity, absent evidence to the contrary (having the Commissioner's legal advisor at her side is insufficient). The record does not reflect that the ADIC participated in the investigation or issuance of the Cease–and–Desist Order. Although the Commissioner participated as a witness at the hearing to explain his rationale for the Cease–and–Desist Order, there is no evidence in the record that he (or his legal advisor) participated in the ultimate administrative decision-making process or influenced improperly the ADIC.[11] Simply because the ADIC was delegated by the Commissioner to conduct the hearing does not make her *a fortiori* a slavish lapdog subject to the Commissioner's will.[12] Respondents simply have not overcome the

---

11. The Commissioner's presence at the hearing ostensibly was compelled by Respondents' subpoena for his presence. While this fact is not dispositive of their claim, it is a bit anomalous for Respondents to request a witness to attend and then complain that the witness's presence was indicative of "command influence" or an improper combination of investigatory and adjudicatory proceedings within an agency.

12. The ADIC is an attorney admitted to the Maryland Bar and bound by her oath to uphold the U.S. and Maryland Constitutions, including the

presumption that the ADIC was a proper delegee of the hearing and decision-making responsibilities. Respondents rest, as Morgan did, on the per se, blanket inability of an agency to hear fairly a contested case, after it investigates and issues a Cease–and–Desist Order. The argument that the Commissioner "prejudged" the merits of the eventual hearing is not persuasive, because the Commissioner delegated properly the hearing and decision-making responsibilities to the ADIC; therefore, the Commissioner was not a person who "must make factual determinations on contested fact issues ... where fact finding is critical." There were no material factual disputes to be resolved at the administrative hearing. Moreover, as discussed *supra*, there is no tangible evidence of actual or perceived "command influence." Finally, even if the appearance of "command influence" existed, as Respondents allege, the reviewing court's non-deferential standard of review of the issues of law decided by the ADIC would ensure that any errors of law would be considered fairly.

Having resolved that the Circuit Court and the Court of Special Appeals erred in how they decided the only question reached by those courts, from among the several placed before them, we, in the exercise of our discretion (and because the other questions presented were pressed by the parties below and may fairly be decided on the record made), shall decide the other questions presented.

### B. Propriety of the Cease–and–Desist Order.

#### i. Was the MIA required to proceed via formal rulemaking?

 We review the MIA's decision to proceed by adjudication, rather than rulemaking, according to the very deferential abuse of discretion standard, where only actions that are "arbitrary and capricious" are overturned. *Consumer Publ'g,* 304 Md. at 754–55, 501 A.2d at 60; *Spencer,* 380 Md. at 529,

---

protections of due process of law. Maryland Code (1989, 2010 Repl. Vol.), Bus. Occ. & Prof. Art., § 10–212.

846 A.2d at 349. In *Consumer Publishing*, an advertising company argued that the Consumer Protection Division was required to proceed by rulemaking, rather than adjudication, because resolution of the dispute over alleged "deceptive" advertising practices would be industry-wide in impact. 304 Md. at 753, 501 A.2d at 60. We disagreed, concluding that even if the practices were shown to be industry-wide, the agency would not be limited to a rulemaking remedy because courts have held generally that agencies "[are] not precluded from announcing new principles in ... adjudicative proceeding[s] and that the choice between rulemaking and adjudication lies ... within the [agency's] discretion." *Id.* (quoting *NLRB v. Bell Aerospace Co.*, 416 U.S. 267, 293, 94 S.Ct. 1757, 1771, 40 L.Ed.2d 134, 153 (1974)) (summarizing the holdings in *SEC v. Chenery Corp.*, 332 U.S. 194, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947) and *NLRB v. Wyman–Gordon Co.*, 394 U.S. 759, 89 S.Ct. 1426, 22 L.Ed.2d 709 (1969)).

The U.S. Supreme Court, in *Chenery*, emphasized the importance of allowing agencies to retain the flexibility to determine when to proceed by rulemaking in order to maintain an effective administrative process. 332 U.S. at 202–03, 67 S.Ct. at 1580–81, 91 L.Ed. at 2003 ("There is thus a very definite place for the case-by-case evolution of statutory standards. And the choice made between proceeding by general rule or by individual, ad hoc litigation is one that lies primarily in the informed discretion of the administrative agency.") We mentioned in *Consumer Publishing* the more restrictive rule explicated in *Ford Motor Co. v. FTC*, 673 F.2d 1008, 1009 (9th Cir.1981), *cert. denied*, 459 U.S. 999, 103 S.Ct. 358, 74 L.Ed.2d 394 (1982), that rulemaking should be required when an agency adopts a new, retrospectively applied, ruling with widespread application. Even under the narrower view in *Ford Motor*, however, we opined that the Consumer Protection Division there did not "change existing law ... of widespread application," but simply applied the statute to the facts in the case. 304 Md. at 756, 501 A.2d at 61.

In *Baltimore Gas & Electric Company v. Public Service Commission*, 305 Md. 145, 153, 501 A.2d 1307, 1310–11 (1986),

Baltimore Gas & Electric ("BGE") sought three separate fuel rate adjustments from the Public Service Commission ("PSC"). At issue in the eventual administrative appeals were the portions of each fuel rate adjustment attributed to the cost of purchasing alternative electricity during forced power outages. *Balt. Gas & Electric*, 305 Md. at 153, 501 A.2d at 1311. Section 54(F) of the Public Service Commission Law directed the PSC to base any decision on fuel rate adjustments on four enumerated factors.[13] Maryland Code (1957, 1980 Repl.Vol.) Article 78 § 54F. After evidentiary hearings, the PSC denied, under § 54F(f)(4) requiring BGE to maintain the "productive capacity of all its generating plants at a reasonable level," portions of the requested rate increases because BGE had not proved the outages were not due to improper management. *Id.*

BGE appealed the PSC's decision, arguing that the PSC interpreted improperly the "reasonable level" provision of § 54(F)(f)(4), *id.*, based on the fact that a year prior to the first forced outage, the PSC approved BGE's initial application for fuel rates under § 54(F), noting that BGE's availability of generating units was well above the industry average. *Balt. Gas & Electric*, 305 Md. at 163, 501 A.2d at 1316. BGE argued that the PSC's application of "reasonable level" to the later rate adjustment request was improper because the PSC investigated the cause of specific outages, rather than relying solely on the well-above-average generator availability found in the earlier application. *Balt. Gas & Electric*, 305 Md. at 169, 501 A.2d at 1319. We rejected BGE's argument, concluding that "reasonable level" was a vague term, that the PSC, when it issued the order after the first rate adjustment hearing, outlined the internal procedures used to evaluate

---

13. The PSC must consider whether "(1) [o]nly changes in the actual costs of the components of the fuel rate are included in the proposed change; (2) [t]he applicant has used the most economical mix of all types of generation and purpose; (3) [t]he applicant has made every reasonable effort to minimize fuel costs and followed competitive procurement practices; (4) the applicant has maintained the productive capacity of all its generating plants at a reasonable level." Maryland Code (1957, 1980 Repl.Vol.) Article 78 § 54F(f).

reasonableness, and that those procedures allowed specifically the PSC to investigate specific outages. *Balt. Gas & Electric,* 305 Md. at 159–61, 501 A.2d at 1314–15. We found persuasive that the PSC maintained this interpretation during the subsequent hearings. *Id.* We concluded that the PSC's interpretation of "reasonable level" was proper, that it articulated clearly internal procedures for determining "reasonable level" through an adjudicative proceeding, and that its application of the internal procedures was consistent. *Balt. Gas & Electric,* 305 Md. at 165, 501 A.2d at 1319. This was not a case "in which materially modified or new standards were applied [retrospectively] to the detriment of a company that had relied upon the [PSC's] past pronouncements"; rather, this was a situation where "the orderly growth and development of legal principles" was achieved through contested case proceedings. *Id.*

We held, however, that rulemaking was required, rather than adjudication, in the particular circumstances presented in *CBS Inc. v. Comptroller of the Treasury,* 319 Md. 687, 688, 575 A.2d 324, 324 (1990) ("CBS"). In the years up to, and including 1980 and 1981, CBS, a New York corporation, calculated its Maryland taxes according to the three-factor formula in Code of Maryland Regulations ("COMAR") § 03.04.01.03E (which governs apportionment of taxes for a unitary corporation) that apportioned a part of CBS's taxable income to Maryland. *CBS,* 319 Md. at 690, 575 A.2d at 325. The calculation of the formula was influenced by the fact that CBS had nationwide advertising receipts, but no property or payroll in Maryland. *Id.* In the years prior to 1980, the calculation was reviewed by the Comptroller during tax audits and no adjustments were made to the formula. *Id.* In 1980 and 1981, the Comptroller audited CBS's tax returns and insisted, for the first time, that the formula be modified to compare the total network audience to the specific audience in Maryland, which resulted in a significant increase in taxes. *Id.* After a hearing officer in the State Income Tax Division upheld the Comptroller's audit, CBS appealed to the Maryland Tax Court, which sided with CBS, agreeing that a change in tax

calculation needed to be accomplished through rulemaking and not by *ad hoc* adjudication. *Id.* The Circuit Court for Baltimore City, at the Comptroller's behest, reversed the Tax Court and affirmed the Comptroller's decision. *CBS,* 319 Md. at 691, 575 A.2d at 325. When the case reached our Court, however, we agreed with the finding of the Tax Court that, "when a policy of general application, embodied in or represented by a rule, is changed to a different policy of general application, the change must be accomplished by rulemaking." *CBS,* 319 Md. at 696, 575 A.2d at 328. The Tax Court found that, until the audits of 1980 and 1981, the Comptroller consistently interpreted the COMAR § 03.04.01.03E as allowing CBS, and other corporations, to include national advertising revenues in its tax calculations. *CBS,* 319 Md. at 697, 575 A.2d at 329. The Comptroller's change to the "audience share method" of apportioning advertising revenue was a "substantial deviation" from the prior interpretation, that "in no way can ... be termed refinement." *Id.* We distinguished *Consumer Publishing* on the basis that there was an existing regulation in the COMAR and the adjudication in *CBS* resulted in a change to existing regulations with widespread application. *CBS,* 319 Md. at 699, 575 A.2d at 330.

A recent treatise on Maryland Administrative Law comments that rulemaking is preferable to, or viewed as fairer than, adjudication because the resultant rules are binding on an entire industry, rather than only on the parties to the contested case. Arnold Rochvarg, *Principles and Practice of Maryland Administrative Law* 266–67 (2011). Also, rulemaking, it is claimed, provides greater notice and public participation and applies only to future conduct, rather than operating retrospectively. *Id.* Professor Rochvarg opines further, however, that an agency's decision to proceed by adjudication, rather than rulemaking, should not be the grounds for overturning a discrete adjudication, despite this Court's reasoning in *CBS.* Rochvarg, *supra,* at 268. He bases this notion on the fact that parties to a contested case hearing receive more procedural rights than they would have during the rulemaking process, including the right to cross-examine witnesses and

the requirement that the agency's decision must be based entirely on the hearing record. Rochvarg, *supra*, at 268–69.

The present case, it seems to us, falls within the holding of *Consumer Publishing*, rather than the exception to the rule articulated in *CBS*. As in *Consumer Publishing*, there was no change in existing law or regulation in the present case, but rather an application of the existing law to the facts in the case. Even if the MIA's enforcement posture was arguably at odds with an inference drawn from its past disinclination to adopt rules prohibiting application of the Rule of 78s, *Chenery* teaches that agencies "are not precluded from announcing new principles in adjudicative proceedings." This is similar to the "orderly growth and development of legal principles" upon which we based our decision on *BGE*. The parties to the contested case here are the nine largest PFCs in the industry.[14]

Importantly, the reach of the Final Order was not retrospective, instead deciding the facts before it and imposing requirements for prospective activities, including prohibitions on using past approved forms that violate Ins. Art., § 23–304 and imposing finance charges that exceed 1.15% for each 30 days on any and all premium finance agreements (including those found later to be void *ab initio* ). In the special circumstances of Insurance Billing Services and U.S. Capital Associates, the Final Order required a refund of finance charges where the underlying insurance policies were declared void *ab initio*, plus pre-judgment interest, but from the date of the Cease–and–Desist Order.

The parties in this case were given all of the procedural rights of a contested case hearing under the State APA. Respondents had ample time and ability to produce a full

---

14. The Commissioner issued contemporaneously a press release with the Cease–and–Desist Order. In addition, the MIA issued a bulletin to all PFCs and interested parties on 10 October 2008, reminding the parties of the requirements of Ins. Art., § 23–304. The press release and bulletin provided public notice to other PFCs that may have been calculating interest charges under Ins. Art., § 23–304 improperly.

record at the administrative hearing and to cross-examine witnesses for the MIA, including the Commissioner. The decision of the ADIC was based on the record. The hearing and Final Order, upon judicial review, were subject generally to non-deferential standards of judicial review as to claimed errors of law.

Respondents argue that the past actions (and inactions) of the MIA, condoning implicitly the use of the Rule of 78s by the PFCs, were changed substantially by the Cease–and–Desist Order, and therefore, the holding of *CBS* should apply to the present case.[15] The holding of *CBS* is confined, however, to situations where the agency's adjudication changed substantially the application or effect of an existing law or regulation, not to an agency's interpretation of a stand-alone statute. No law or regulation was changed by the MIA and, based on our interpretation of Ins. Art. § 23–304, *infra*, we fail see any benefit in a public rulemaking process for the agency to receive comments on the interpretation of a statute that is, in our view, clear on its face.

ii. Did the Commissioner have statutory authority to issue the Cease–and–Desist Order to the PFC's?

■■■ Respondents argue that the Commissioner has no statutory authority to issue cease-and-desist orders against the PFCs. They point to express grants of authority to issue cease-and-desist orders in other sections of the Insurance Article[16] as an indication that the absence of a similar enumer-

---

**15.** Respondents offer as proof of the MIA's condonation: (1) past PFCs' registration statements and premium finance agreements where the PFCs state that they used the Rule; (2) a facsimile sent in 1994 from the MIA to a PFC acknowledging that PFCs use the Rule; and (3) a letter from an Assistant Attorney General to the General Assembly saying that a PFC may "elect its own method" of calculating finance charges under Ins. Art., § 23–304.

**16.** The general requirements allude to the Commissioner's power to issue cease-and-desist orders to insurers when there are circumstances involving threats of insolvency and irreparable loss and injury to property or the general public. Ins. Art., § 4–114. The power to issue cease-and-desist orders is also explicitly mentioned in Ins. Art., § 27–

ated power in the Premium Financing Title means that the Legislature intended that the Commissioner have no authority to issue the present Cease–and–Desist Order to the PFCs. This argument implicates the maxim of statutory construction, *expressio unius est exclusio alterius*, meaning "to express or include one thing implies the exclusion of the other, or of the alternative." *Breslin v. Powell*, 421 Md. 266, 286, 26 A.3d 878, 891 (2011) (citing *Kirkwood v. Provident Sav. Bank of Balt.*, 205 Md. 48, 55, 106 A.2d 103, 107 (1957)); *see also* Black's Law Dictionary 661 (9th ed.2009). We have cautioned against the too easy use of this statutory construction tool to override the clear intent of the Legislature, and in this case we are not persuaded by Respondents to ignore our advice in that regard. *See Kirkwood*, 205 Md. at 55, 106 A.2d at 107. A broad grant of power is given to the Commissioner to enforce the Insurance Article. Section 2–108 of the Insurance Article sets forth the general powers and duties of the Commissioner:

In addition to any powers and duties set forth elsewhere by the laws of the State, the Commissioner:

(1) has the powers and authority expressly conferred on the Commissioner by or *reasonably implied* from this article;

(2) shall enforce this article;

(3) shall perform the duties imposed on the Commissioner by this article; and

(4) in addition to examinations and investigations expressly authorized, may conduct examinations and investigations of insurance matters as necessary to fulfill the purposes of this article. (Emphasis added.)

Respondents imagine that the Commissioner's powers to enforce the Insurance Article are limited to bringing "an action in a court of competent jurisdiction to enforce this article or an order issued by the Commissioner under this article" and, therefore, he/she may not issue a cease-and-desist order unless that power is enumerated specifically in a partic-

103 (governing unfair trade practices), and in Ins. Art., § 25–308 (governing group self-insurance for workers compensation).

ular title. *See* Ins. Art., § 2–201(a). We rejected the same argument, and upheld the Commissioner's power to enforce the provisions of the Insurance Article, in *Insurance Commissioner v. Property & Casualty Insurance Guaranty Corp.,* 313 Md. 518, 546 A.2d 458 (1988). There, we affirmed the Commissioner's authority to order Property Casualty Insurance Guarantee Corporation ("PCIGC") to pay personal injury protection claims, on behalf of insolvent insurers, despite that "[n]owhere in the Insurance Code is the power to order PCIGC to pay claims expressly conferred upon the Commissioner," and the particular section addressing "the powers of the Commissioner with respect to PCIGC, contains no express authorization." *Ins. Comm'r,* 313 Md. at 526–28, 546 A.2d at 463.

We agree with the MIA that enforcement orders, including the initial Cease–and–Desist Order and the Final Order issued as a result of the administrative hearing here, are basic elements in a "regulator's toolkit." Section 2–108 of the Insurance Article requires that the Commissioner "*shall* enforce" the Insurance Article. (Emphasis added.) In the Premium Financing Title, the Commissioner is given the authority to investigate and examine the books, records, and accounts of the PFCs. Ins. Art., § 23–103(a). After an investigation, the Commissioner is required to issue a report of his/her findings under Ins. Art., § 2–209. Ins. Art., § 23–103(c). These reports provide the explanation and required "grounds on which" an order must be based.[17] Ins. Art., § 2–204(b)(1)(iii).

---

**17.** Under the enforcement provisions of the Insurance Article, orders and notices are governed by § 2–204, which states:

( [1] )(a) *Form.*—An order or notice of the Commissioner must be in writing and signed by the Commissioner or an individual authorized by the Commissioner.

(b) *Contents of order.*—(1) An order of the Commissioner shall state:

(i) its effective date;

(ii) its purpose;

(iii) the ground on which it is based; and

(iv) the provisions of this article under which action is or proposed to be taken.

The Premium Financing Title authorizes the Commissioner to "suspend, revoke, or refuse to renew the registration" of a registered PFC if it fails to comply with a "lawful requirement of the Commissioner," or if it violates a provision of the Title. Ins. Art., § 23–208(a)(1), (a)(2). Further, the Commissioner is authorized to impose civil monetary penalties or restitution.[18] Ins. Art., § 23–208(b)(1)(i), (b)(1)(ii). In the cases of Respondents Insurance Billing Services and U.S. Capital Associates, the Commissioner was authorized specifically by § 23–208 to order these PFCs to provide restitution (in the form of a refund, plus pre-judgment interest) to consumers whose underlying insurance policies were declared ultimately void *ab initio*, after the Cease–and–Desist Order was issued. In the case of the remaining PFCs, the authority to issue the Cease–and–Desist Order against them, compelling compliance with Ins. Art. § 23–304, may be implied reasonably from the overall regulatory scheme revealed in the Insurance Article. The Commissioner is charged with enforcing the provisions of the Insurance Article, including the Premium Financing Title. It does not stand to reason that the Commissioner would be authorized only to suspend altogether a PFC from the business of premium financing, or impose civil penalties, but not authorized to order registered PFCs to comply with the provisions of the Premium Financing Title. We decline to interpret the regulatory scheme to limit the Commissioner to instituting actions in circuit courts or banning a PFC from the business of premium financing in order to compel compliance with a discreet requirement of the Insurance Article. As in *Insurance Commissioner*, despite the absence of an express authorization or power, we conclude that the statute *reason-*

---

(2) Failure to designate a particular provision of this article in accordance with paragraph (1)(iv) of this subsection does not deprive the Commissioner of the right to rely on that provision.

. . .

18. "For purposes of this subsection, restitution means the sum of money that, if paid to a person that suffers financial injury as a result of violation of this title, will restore the person to the same financial position the person would have been in had the violation not occurred." Ins. Art., § 23–208(b)(2).

*ably implies* that the Commissioner is empowered to issue enforcement orders seeking to compel compliance with Ins. Art. § 23–304.

 iii. Did the Cease–and–Desist Order comply with procedural requirements of the Insurance Article?

 We review an alleged violation of regulatory procedures to see if there is a violation of a "substantial right" of the complaining party and, if so, whether prejudice occurred. *Pollock,* 374 Md. at 469 n. 3, 823 A.2d at 630 n. 3. Respondents claim that the Commissioner's Cease–and–Desist Order violated the procedural requirements of the Insurance Article by failing to comply with § 2–209 requiring the MIA to "give a copy of the proposed report to the person that was examined" at least 30 days before filing a report and making it public. The MIA, in response, makes a distinction between a formal examination and the less formal investigation (or analysis) here, each having different procedural requirements.

There is no need for us to dissect the Insurance Article to determine whether an examination, investigation, or analysis was conducted, or what the associated procedural requirements may be with regard to each inquisitory exercise. The only question we need to ponder here is whether, assuming such a shortcoming as the PFCs point to, a substantial right of the PFCs was violated. We answer that question in the negative. The investigation by the Commissioner was based on undisputed facts that were stipulated to eventually by all parties at the administrative hearing. The rationale for the Commissioner's decision was detailed in the Cease–and–Desist Order, provided to Respondents. The results of the investigation were provided to the PFCs in advance of the administrative hearing. The automatic stay of the Cease–and–Desist Order, triggered by the PFCs' request for a hearing, and the subsequent hearing, provided substantially similar procedural protections for the PFCs than are given by Ins. Art., § 2–209. The notice provisions of Ins. Art., § 2–209(c) allow the person

examined an opportunity for a hearing to comment on the report and to suggest changes to the proposed report.

Section 2-209 only requires the Commissioner to accept changes to the report, sought by a responding party, that he/she "considers proper." The ultimate dispute in this case is over the interpretation of Ins. Art., § 23-304. It is unlikely that the Commissioner would have accepted the PFCs' interpretation of the statute advanced here had he given them 30-days advance notice of the report and received the PFCs' views during that period. Thus, even assuming the alleged procedural misstep by the MIA, there was no substantial impairment of any rights of the PFCs and no prejudice to the conduct of the hearing or any subsequent judicial review proceeding.

### C. Statutory Interpretation of § 23-304

 After some struggle with the procedural issues *supra*, we grapple finally with the main gravamen of this process that began in 2008. Quixotically, resolution of the statutory interpretation question proves the easiest to resolve.

 Our goal is to "ascertain and effectuate the intent of the Legislature." *Mayor & Town Council of Oakland v. Mayor & Town Council of Mountain Lake Park*, 392 Md. 301, 316, 896 A.2d 1036, 1045 (2006). We look first to the plain language of a statute, giving the words their natural and ordinary meaning. *Breslin*, 421 Md. at 286, 26 A.3d at 891 (citing *State Dep't of Assessments and Tax'n v. Md.-Nat'l Capital Park & Planning Comm'n*, 348 Md. 2, 13, 702 A.2d 690, 696 (1997)). To determine the plain meaning of language, we may consider always the context in which it appears. *State v. Pagano*, 341 Md. 129, 133, 669 A.2d 1339, 1341 (1996) (citing *Kaczorowski v. Mayor & City Council of Balt.*, 309 Md. 505, 514, 525 A.2d 628, 632 (1987) (the meaning of the plain language "is controlled by the context in which it appears")). If the statute is clear and unambiguous on its face, our inquiry ends usually. *Id.* (citing *Marriott Emps. Fed. Credit Union v. MVA*, 346 Md. 437, 445, 697 A.2d 455, 458 (1997)). If the

statute is ambiguous, we turn to our arsenal of other statutory interpretation forensic tools. *Breslin,* 421 Md. at 287, 26 A.3d at 891 (citing *Lewis v. State,* 348 Md. 648, 653, 705 A.2d 1128, 1131 (1998)) ("[C]ourts will look for other clues—e.g., the construction of the statute, the relation of the statute to other laws in a legislative scheme, the legislative history, and the general purpose and intent of the statute.").

The section of the Premium Finance Title that addresses finance charges states:

The finance charge shall be computed:

(1) on the amount of the entire premium loan advanced, including any taxes or fees that are financed under § 23–301.1 of this subtitle, after subtracting any down payment on the premium loan made by the insured;

(2) from the inception date of the insurance contract or from the due date of the premium, disregarding any grace period or credit allowed for payment of the premium, through the date when the final installment under the premium finance agreement is payable; and

(3) at a rate not exceeding 1.15% for each 30 days, charged in advance.

Ins. Art., § 23–304. Respondents argue that Ins. Art., § 23–304 does not specify a methodology for earning interest, only computing interest over the life of the premium finance agreement. They maintain further that the General Assembly's addition of Ins. Art., § 23–206(b)(3), requiring premium finance companies to disclose "the method or formula used to calculate the finance charges," means that they may charge whatever interest rate they want for each 30–day period, so long as the overall finance charge paid and received over the life of the loan does not exceed 1.15 percent. On the other hand, the MIA argues that the finance charge computation within Ins. Art., § 23–304 is plain on its face, with no ambiguity. We agree with the MIA.

Although Ins. Art., § 23–304 does not prescribe a particular method for calculating the amount of interest per month, the section provides clearly a maximum finance charge for each 30–day period. The word "rate" means a "fixed ratio between

two things," "a charge, payment, or price fixed according to a ratio, scale or standard," or "an amount of payment or charge based on another amount." Webster's Ninth New Collegiate Dictionary 976 (Frederick C. Mish et al. eds., 1989). Here, the fixed charge is "not exceeding 1.15%" on the entire amount of the loan premium and the denominator of the ratio, or the standard, is "each 30 days." Ins. Art., § 23–304 does not state a maximum annualized amount of interest; had that been the Legislature's intent, the fixed durational term would have been "per annum" or "annually." We assume that the General Assembly meant what it said, and the interest charge may not exceed 1.15%, of the entire amount of the loan, during any 30 day period.[19] To interpret this section any other way would render meaningless the very specific durational terms of Ins. Art., § 23–304(c). Respondents assert that this voids per se the Rule of 78s. We find that, so long as the interest rate does not exceed the statutory maximum, the PFCs are free to assess unequal monthly interest charges, according to the Rule or another method.[20] Merely because the statute sets forth a maximum finance charge does not mean the PFCs are obliged to charge their customers the maximum.

---

**19.** While we need not investigate the statutory history here because Ins. Art., § 23–304 is plain on its face, we note the magnitude and nature of the changes made by the 1965 amendments to the Premium Financing Title as confirmation of our conclusion. *See* Chapter 844 of the Acts of 1965. The General Assembly removed a complicated system for calculating the service charge as an *annual rate*, based on the length of the loan, along with a section that provided the service charge monthly installments were to be substantially equal. This complicated language, comprising almost five paragraphs, was replaced with a simple rate of "one half of one per cent per one hundred dollars ($100.00) for each thirty days, charged in advance, upon the entire amount advanced...." If the General Assembly intended to specify an annual rate of interest for the entire amount of the premium finance agreement, it would have left the rate as an annual one, rather than changing radically to "each 30 days."

**20.** Respondents argue that this result will compel them to charge interest rates well below the market in order to comply; however, we note that they may earn competitive market rates, up to the statutory maximum, so long as they spread out equally the charges over the term of the finance period.

 Even were we to find Ins. Art., § 23–304 ambiguous, the result would not be different. The remedial nature of the premium financing statute means that the statutory cap on monthly finance charges is designed to protect consumers. *Gov't Emps. Ins. Co. v. Taylor,* 270 Md. 11, 17–18, 310 A.2d 49, 53 (1973) (citing *Moore v. London Guarantee,* 233 Md. 425, 429, 197 A.2d 132, 134 (1964)) (stating that remedial legislation "must be liberally construed to advance the remedy which was designed to eradicate and eliminate the mischief found to exist"). The Premium Financing Title was designed to reign in "usurious interest and excessive service charges" on premium finance agreements. *Gov't Emps. Ins. Co.,* 270 Md. at 17, 310 A.2d at 52. Respondent PFCs are able to collect cancellation charges under Ins. Art., § 23–307 when a customer defaults on his/her payment obligations, and as discussed *supra,* Ins. Art., § 23–304 determines the maximum monthly finance charges. Ins. Art., 23–504 prohibits charges in excess of those authorized by the Premium Financing Title. The Rule, using the maximum allowed finance charge on a policy, when cancelled prior to maturity, violates the Title by collecting excessive charges on the front end.

 Where the underlying insurance policy is void *ab initio,* Ins. Art., § 23–304(2) states that the "finance charge shall be computed: ... from the inception date of the insurance contract or from the due date of the premium...." The MIA argues that the PFCs financed nothing if the underlying policy was void. During cross-examination of the Commissioner by the PFCs at the administrative hearing, he admitted that money was transferred from a PFC to the MAIF, even when the policy was voided thereafter. This is because payment of the full premium for the insurance policy is due to the MAIF with the consumer's application. COMAR 14.07.02.03(G)(2). At the hearing, the Commissioner acknowledged further that it could be as much as a month between when a PFC forwards the money, on behalf of the consumer who submitted an application to the MAIF, and when the premium was returned to the PFC after a policy is declared void.

We assume that the General Assembly did not intend to create surplusage by including the disjunctive phrase "*or* the due date of the premium" in the statute, and that it meant what it said. This is supported by the reality that PFCs extend the benefits of financing to premium finance customers from the moment when they forward money to the MAIF. The plain language of Ins. Art., § 23–304(2) makes clear that there may be different dates used to calculate the length of time for calculating finance charges, one where an insurance policy comes to inception and another where the contract does not come into existence, but "the amount of the entire premium loan" has been advanced by a PFC. This loaned money, even if it is eventually refunded, is entitled to have finance charges assessed against it until returned to the lending PFC. There-fore, it is permissible for the PFCs to assess finance charges, even where a policy is declared void, *ab initio* or otherwise, so long as the finance charges do not exceed 1.15% for each 30 days (or pro rata portion thereof) during which the money was advanced.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS VACATED AND CASE REMANDED TO THAT COURT WITH DIRECTIONS TO VACATE THE JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY AND TO REMAND THE CASE TO THE CIRCUIT COURT WITH DIRECTIONS TO AFFIRM IN PART AND REVERSE IN PART THE DECISION OF THE MARYLAND INSUR-ANCE COMMISSION, CONSISTENT WITH THIS OPIN-ION. COSTS IN THIS COURT AND THE COURT OF SPECIAL APPEALS TO BE PAID BY, AND EQUALLY DIVIDED AMONG, RESPONDENTS.**