Keith Merryman and Fraternal Order of Police, Lodge 146 v. University of Baltimore, No. 33, September Term, 2020

**LABOR AND EMPLOYMENT – MD. CODE ANN., EDUC. (1978, 2014 REPL. VOL.) ("ED") §§ 13-201 TO 13-207 – GRIEVANCE PROCEDURE – ED § 13-201(c) – "GRIEVANCE" – "GRIEVABLE ISSUE" –** Court of Appeals held that, under memorandum of understanding between parties, which incorporated grievance procedures set forth in Md. Code Ann., Educ. (1978, 2014 Repl. Vol.) ("ED") §§ 13-201 to 13-207, including definition of "grievance" set forth in ED § 13-201(c), complaint brought by petitioners concerning holiday leave was not grievable issue because it was dispute that "pertain[ed] to [] general level of . . . fringe benefits, or to other broad areas of financial management and staffing[.]"  Holiday leave is fringe benefit and complaint concerning number of hours of holiday leave to which all officers are entitled, which essentially requested that each officer receive additional twenty-two hours of holiday leave per year, was complaint pertaining to general level of fringe benefits provided to officers and thus not grievable issue.

IN THE COURT OF APPEALS

OF MARYLAND

No. 33

September Term, 2020

_____

KEITH MERRYMAN AND FRATERNAL
ORDER OF POLICE, LODGE 146

v.

UNIVERSITY OF BALTIMORE

_____

Barbera, C.J.
McDonald
Watts
Hotten
Getty
Booth
Biran,

JJ.

_____

Opinion by Watts, J.

_____

Filed: March 26, 2021

Pursuant to Maryland Uniform Electronic Legal
Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Suzanne C. Johnson, Clerk

Md. Code Ann., Educ. (1978, 2014 Repl. Vol.) ("ED") §§ 13-201 to 13-207 sets forth grievance procedures used to resolve certain disputes or complaints between the institutions that comprise the University System of Maryland and their employees. ED § 13-203 establishes a three-step procedure for addressing grievances brought by employees. To be subject to the three-step grievance procedure, a complaint must meet the definition of a grievance as set forth in ED § 13-201(c) and must not be a matter that the section identifies as not a grievable issue:

> "Grievance" means any cause of complaint arising between a classified employee or associate staff employee and his employer on a matter concerning discipline, alleged discrimination, promotion, assignment, or interpretation or application of University rules or departmental procedures over which the University management has control. However, if the complaint pertains to the general level of wages, wage patterns, fringe benefits, or to other broad areas of financial management and staffing, it is not a grievable issue.[1]

---

[1]The definition of "grievance" contained in ED § 13-201(c) is the version of the statute that was incorporated into a memorandum of understanding between the parties in this case and which remained in effect as the parties went through the three-step grievance process concerning the dispute at issue in the case. Effective October 1, 2019, the General Assembly amended ED § 13-201(c). See 2019 Md. Laws 4069-71 (Vol. V, Ch. 697, H.B. 822); 2019 Md. Laws 4072-74 (Vol. V, Ch. 698, S.B. 711). Md. Code Ann., Educ. (1978, 2018 Repl. Vol., 2019 Supp.) § 13-201(c) now provides:

> (1) "Grievance" means any cause of complaint arising between a regular full-time or part-time employee and the University on a matter concerning discipline, alleged discrimination, promotion, assignment, or interpretation or application of University rules or departmental procedures over which the University management has control.

> (2) "Grievance" does not include:

> (i) Complaints on the general level of wages, wage patterns, fringe benefits, or other broad areas of financial management and staffing; or

ED § 13-203(a) provides that the three-step grievance procedure is available only if, after informal discussion with a supervisor, a dispute remains unresolved. ED § 13-203(b) describes step one of the grievance procedure, which involves initiation of a complaint presented to a department head or chairman or designee followed by a conference and a written decision from the department head or chairman or designee. ED § 13-203(c) sets forth step two of the grievance procedure—appeal of the initial written decision—which similarly involves a conference followed by a written decision from the president of the constituent institution or the president's designated representative. ED § 13-203(d) sets forth step three of the grievance procedure, which involves arbitration or submission of the grievance to the Chancellor of the University System of Maryland, who may delegate responsibility to the Office of Administrative Hearings for an administrative hearing to be conducted by an administrative law judge.

In this case, the Fraternal Order of Police, Lodge 146 ("the Union"), Petitioner, is the bargaining unit representative of the police officers who work at the University of Baltimore ("the University"), Respondent. Keith Merryman, Petitioner, is a police officer employed by the University and the President of the Union.[2] In January 2018, the

---

> (ii) Any cause of complaint by any employee who is not represented by an exclusive representative under Title 3 of the State Personnel and Pensions Article.

The amendment to the definition of "grievance" set forth ED § 13-201(c) is of no consequence to our analysis.

[2]Although both Merryman and the Union are Petitioners, because Merryman's involvement in the case is due to his role as the President of the Union, unless specifically referring to an action that Merryman individually took, we refer to actions by Petitioners as actions by the Union.

University implemented a work schedule change for police officers, moving from five eight-hour shifts to four ten-hour shifts per week. The schedule change did not affect the total number of hours police officers were required to work a week. According to Merryman, because, as a result of the schedule change, an officer's workday now consisted of ten hours, each holiday should also "be credited at the same rate of 10 hours." In other words, the Union sought to have a holiday defined as consisting of ten hours, seeking a total of 110 hours rather than eighty-eight hours of holiday leave per year, essentially requesting twenty-two additional holiday leave hours per year for all officers of the Union.

Merryman, on behalf of himself and all other members of the Union, initiated a Step 1 Grievance through the statutory grievance procedure, which had been incorporated into a memorandum of understanding between the parties. The University concluded that the complaint pertained to fringe benefits and staffing and was not a grievable issue under the memorandum of understanding and ED § 13-201(c). Merryman next submitted a Step 2 Grievance. The University again concluded that, pursuant to the memorandum of understanding and ED § 13-201(c), holiday leave is a fringe benefit, and a dispute involving holiday leave is not a grievable issue. Additionally, the University determined that it could not increase the amount of holiday leave authorized by the University System of Maryland and the Board of Regents.

The Union filed a Step 3 Grievance with the Office of Administrative Hearings, requesting a hearing before an administrative law judge ("ALJ"). The University moved to dismiss the grievance on the ground that a complaint about holiday leave was not grievable because it was a complaint pertaining to fringe benefits. Following a hearing on

the motion to dismiss, the ALJ denied the motion, concluding that the issue raised by the Union was one of contract interpretation and thus grievable. Thereafter, the ALJ conducted an evidentiary hearing on the merits, and issued a written decision ruling in favor of the Union. Among other things, the ALJ concluded that, as a result of the schedule change, the University effectively changed the definition of a workday from eight hours to ten hours and that the memorandum of understanding should be interpreted to provide officers with ten hours of paid leave for each holiday (rather than eight hours). The ALJ ordered the parties to identify the officers affected by the schedule change (officers who had used non-holiday leave hours for a holiday) and to credit those officers with the non-holiday hours used.

The University sought judicial review in the Circuit Court for Baltimore City. After a hearing on the matter, the circuit court issued an order affirming in part and reversing in part the ALJ's decision. The circuit court affirmed the ALJ's conclusion that the University changed the definition of a workday to ten hours and that the change affected the allocation of holiday leave. The circuit court reversed, however, as to all other conclusions made by the ALJ. The circuit court found that, pursuant to ED § 12-105, neither the circuit court nor the ALJ could issue an order that had the effect of increasing the budget of the University System of Maryland.[3]

---

[3]ED § 12-105(a)(1)(ii) provides that, "[i]n consultation with the institutions and the Chancellor, the Board [of Regents] shall: [r]eview, modify, as necessary, and approve consolidated budget requests for appropriations for the University System of Maryland with respect to: 1 The operating budget; and 2. The capital budget[.]" (Paragraph breaks omitted).

The Union appealed to the Court of Special Appeals, which, in a reported opinion, held that the ALJ lacked jurisdiction over the complaint because the dispute was not a grievable issue under the statutory grievance procedure contained in the memorandum of understanding.  See Merryman v. Univ. of Baltimore, 246 Md. App. 544, 560, 231 A.3d 498, 508 (2020).  The Court of Special Appeals concluded that the parties could not, by agreement, confer jurisdiction upon the ALJ by expanding the scope of grievances covered by the statutory procedures incorporated into the memorandum of understanding.  See id. at 559, 231 A.3d at 507.  Because it held that the ALJ lacked jurisdiction, the Court of Special Appeals did not address the merits of the ALJ's decision or the propriety of the remedy ordered.  See id. at 560, 231 A.3d at 508.  The Court of Special Appeals vacated the circuit court's judgment and remanded the case to that court with instruction to remand the case to the ALJ for the ALJ to dismiss the grievance proceeding.  See id. at 561, 231 A.3d at 508.  Thereafter, the Union filed in this Court a petition for a writ of *certiorari*, which this Court granted.  See Merryman v. Univ. of Baltimore, 471 Md. 101, 240 A.3d 852 (2020).

Against this backdrop, at bottom, we must determine whether the complaint about holiday leave presents a grievable issue that is subject to the three-step grievance procedure set forth in the memorandum of understanding.  We hold that, under the memorandum of understanding, which incorporates the grievance procedures set forth in ED §§ 13-201 to 13-207, including the definition of a "grievance" set forth in ED § 13-201(c), the complaint brought by the Union concerning holiday leave does not constitute a grievable issue because it is a dispute that "pertains to the general level of . . . fringe benefits, or to other

- 5 -

broad areas of financial management and staffing[.]" Holiday leave is a fringe benefit and the complaint concerning the number of hours of holiday leave to which officers are entitled—which essentially requested that each officer receive an additional twenty-two hours of holiday leave per year—is a complaint pertaining to the general level of fringe benefits provided to officers and as such is not a grievable issue. As such, we affirm the judgment of the Court of Special Appeals, although for somewhat different reasons.

## BACKGROUND

### Policy VII-7.30

The Board of Regents of the University System of Maryland has adopted Policy VII-7.30 (Policy on Holiday Leave for Regular Nonexempt and Exempt Staff Employees), Part II (Amount of Holiday Leave) of which states that "[e]mployees are eligible to earn 11 holidays per year, or 12 holidays during a year of general or congressional elections[.]"[4] Part IV (Scheduling of Holidays for Continuous Operations) states:

> Institutions which have departments that must provide service on a continuous seven day-a-week basis may schedule an employee's holidays. Affected departments may schedule a specific day or days each month as a day off, and these days shall be treated in the same manner as regular holidays are treated for other employees. For employees in this category, one day of holiday leave shall be granted for each month, except that for the months of January and July when two days of holiday leave shall be granted. During a year of general or congressional elections, an additional day shall be granted for the month of November. Institutions have the sole discretion to determine which individual employees in a department will be placed in this category.

---

[4]On December 3, 1999, the Board of Regents adopted Policy VII-7.30. On January 2 and 12, 2000, Policy VII-7.30 became effective, and was later amended on October 9, 2015.

## The Memorandum of Understanding

The Union and the University entered into a Memorandum of Understanding, effective from July 1, 2016 through June 30, 2017 ("the MOU").[5] The MOU applies to the relationship between the University and its sworn police officer unit.[6] Article 6 of the MOU, entitled "Hours of Work," addresses officers' work hours. Pursuant to Section 1 of Article 6, a "regular workday" for University police consists of eight hours. According to Section 3, a "regular workweek" consists of five regular workdays. Section 5 gives the University the discretion to change the work schedule "as deemed necessary to meet the operational needs of the University[,]" provided that the University gives the affected officers at least fourteen days' notice of any permanent change in the work schedule.

---

[5]The MOU contained in the record indicates that it expired on June 30, 2017. The dispute regarding holiday leave occurred after that date. Section 2 of Article 29 of the MOU contemplated renewal of the MOU, though, stating:

> Should either party desire to negotiate a successor MOU, they may only do so by providing written notification of its intent to do so to the other party by August 1, 2016. After notification is provided, the parties shall then commence negotiations for a successor MOU during the remainder of the last year of this MOU at dates and times agreed by the parties.

At an evidentiary hearing before the ALJ, a witness for the University testified that the MOU was still in effect, and that there was a revised agreement pending ratification. Like the Court of Special Appeals, we assume that the MOU was renewed or otherwise extended. See Merryman v. Univ. of Baltimore, 246 Md. App. 544, 547 n.2, 231 A.3d 498, 500 n.2 (2020).

[6]According to the MOU, the terms "employees," "sworn police officers," and "employees covered by this MOU" "mean all eligible sworn police officers employed by the University in the following job classifications: Police Officer I, Police Officer II."

The MOU addresses various forms of leave.[7] Relevant here, Article 15 of the MOU addresses holidays. Section 1 of Article 15, entitled "Recognized Holidays," states that "[b]argaining unit employees are eligible to earn 11 holidays per year, or 12 holidays during a year of general or congressional elections, and any other special observance as required by the legislature and Governor." Section 1 lists twelve holidays for which bargaining unit employees were eligible in an election year, including Election Day. In addition to those holidays, bargaining unit employees are granted three administrative holidays each year.

Section 2 of Article 15 of the MOU, titled "Scheduling of Holidays for Continuous Operations," explains that University police would sometimes be required to work on holidays, but would be permitted to use accrued holiday leave hours to schedule an alternative day off or, if rescheduling was not possible, an officer could cash in the hours and receive a day's pay in lieu of taking another day off. Specifically, Section 2 provides:

> Holidays for Sworn Police Officers will be prescheduled based upon the workweek schedule rotation. The University reserves the right to assign holidays in accordance with this schedule rotation and shall make an effort to grant the Employee the day off requested, subject to operational needs. An Employee may be required to work on the Employee's prescheduled holiday. If required to work on their prescheduled holiday, the Employee will be paid at their regular straight time rate of pay for all hours worked plus any overtime pay required in accordance with Article 6 Hours of Work, Section 7 of this MOU. However, in the event, the Officer is required to

---

[7]For example, Article 12 of the MOU addresses sick leave. Article 13 addresses other types of leave, including annual leave, personal leave, the leave reserve fund, family and medical leave, jury service and legal actions leave, educational leave and professional improvement leave, administrative leave, military leave with pay, call-up to active military duty during a national or international crisis or conflict, leave of absence without pay, leave for disaster service, accident leave, and parental leave. Article 14 addresses union leave— leave "for the purpose of participating in approved union activities."

- 8 -

work on Thanksgiving Day and/or Christmas Day the Employee will receive pay at the rate of one and half (1½) times their regular straight time rate of pay for all hours worked on those days. In addition, the Employee shall be granted the holiday with pay or an alternative date to be scheduled by the University within forty-five (45) days of the date initially pre-scheduled, provided however that, if all operational needs prevent the rescheduling of the holiday within that ninety (90) day period, the University will reschedule the holiday within six (6) months of the date initially pre-scheduled. Subject to operational needs, the University will make a good faith effort to schedule an employees' [sic] pre-scheduled or alternative holidays on a mutually agreeable date, however, the employee may be paid at the applicable rate for all hours worked and provided with a regular day's pay as holiday pay in lieu of being granted another day off.

Section 3 of Article 15, entitled "Termination Payment," provides: "Employees, who leave their employment at the University for any reason, are entitled to be paid for any unused holiday leave that has been earned as of the date of separation."

Aside from recognizing that University police officers are eligible to earn eleven holidays per year (twelve during a general or congressional election year), neither Article 15 nor any other Article in the MOU specifies how many hours of paid leave officers accrued for each holiday, *i.e.*, how many hours were in a holiday.

Article 11 of the MOU, entitled "Grievance Procedure," outlines the procedures for resolving certain disputes between the Union and the University. In relevant part, Article 11 states:

> In the event of an alleged violation or disagreement over any of the provisions of this MOU, a bargaining unit employee represented by FOP, which shall be the exclusive employee organization to represent the employees, shall have the right to file a grievance in accordance with Section 13-201 et seq. of the Annotated Code of Maryland, Education Article, a copy of which is set forth below for convenient reference.

(Underlining omitted). Article 11 quotes and incorporates into the MOU ED §§ 13-201 to

13-207.

## Relevant Statutory Provisions

The provisions of the Education Article incorporated into Article 11 of the MOU set forth procedures for addressing grievances. ED § 13-201(c), as incorporated into the MOU, defines a "grievance" as

> any cause of complaint arising between a classified employee or associate staff employee and his employer on a matter concerning discipline, alleged discrimination, promotion, assignment, or interpretation or application of University rules or departmental procedures over which the University management has control. However, if the complaint pertains to the general level of wages, wage patterns, fringe benefits, or to other broad areas of financial management and staffing, it is not a grievable issue.

ED § 13-203(a) provides for a three-step grievance procedure that is available only "[i]f, following informal discussion with [a] supervisor, a dispute remains unresolved[.]" ED § 13-203(b) describes step one of the grievance procedure, which involves initiation of a complaint followed by an initial conference and a written decision, stating:

> (1) Step One. Step one is the initiation of a complaint. Grievances shall be initiated within 30 calendar days of the action involved, or within 30 calendar days of the employee having reasonable knowledge of the act, unless these time limits are further delimited as stated in § 13-205 of this subtitle. Appeals within the grievance procedure shall be timed from receipt of the written opinion of management or from when such opinion is due, whichever comes first. An aggrieved employee or the employee's designated representative may present the grievance in writing to the department head or chairman or designee for formal consideration. If the grievance is presented to the department head or chairman or designee, within 5 days after the receipt of the written grievance a conference shall be held with the aggrieved or the employee's designated representative and within 5 days after the conclusion of the conference a decision shall be rendered in writing to the aggrieved or the employee's designated representative. If the aggrieved employee is not satisfied with the decision rendered at this step, the employee or the employee's designated representative may appeal in writing to step two within 5 days.

(2) Both employee and department head or chairman or designee shall continue to review the matter, either privately or with the help of others in the employee's immediate work unit who are directly involved in the grievance. Each department head or chairman or designee shall use judgment in keeping superiors informed of the status of each grievance and, if necessary, request guidance, advisory committees, or other assistance consistent with departmental policy. If either the employee or the department head or chairman or designee feels the need for aid in arriving at a solution, the campus personnel department may be requested to provide resource staff or any other available resource personnel may be invited to participate in further discussions. The addition of such participants does not relieve the department head or chairman or designee and the employee from responsibility for resolving the problem.

ED § 13-203(c) sets forth step two of the grievance procedure—appeal of the initial

written decision—stating:

Step Two. The appeal shall be submitted to the president of the constituent institution or the president's designated representative within 5 days after the receipt of the written decision at step one. The president or the president's designated representative shall hold a conference with the aggrieved or the employee's designated representative within 10 days of receipt of the written grievance appeal and render a written decision within 15 days after the conclusion of the conference.

ED § 13-203(d) sets forth step three of the grievance procedure, which involves

arbitration or an administrative hearing before an ALJ, stating:

Step Three. In the case of any still unresolved grievance between an employee and the constituent institution, the aggrieved employee, after exhausting all available procedures provided by the constituent institution, may submit the grievance to either arbitration or to the Chancellor who may delegate this responsibility to the Office of Administrative Hearings in accordance with Title 10, Subtitle 2 of the State Government Article. In either case, the appeal shall be submitted within 10 days after the receipt of any written decision pertaining to that grievance and issued by the constituent institution. If the grievance is arbitrated, the parties shall select an arbitrator by mutual agreement. If they are unable to reach a mutual agreement, an arbitrator shall be supplied by the American Arbitration Association by their procedures. Any fees resulting from arbitration are assessed by the arbitrator

equally between the two parties. The arbitration award is advisory to the Chancellor or administrative law judge, as appropriate, and an additional appeal or hearing may not be considered. The Chancellor or administrative law judge, as appropriate, shall make the final decision that is binding on all parties.

ED § 13-204 provides:

A decision may not be made at any step of the grievance procedure that conflicts with or modifies a policy approved by the Board of Regents of the University System of Maryland or with any applicable statute or with any administrative regulation issued under appropriate statutory authority or that otherwise delimits the lawfully delegated authority of University officials unless prior approval has been obtained from the responsible official.

## The Holiday Leave Dispute

In a memorandum to sworn personnel of the University's police department dated November 7, 2017, the department's chief, Samuel D. Tress, stated that, effective January 3, 2018, the department would transition from eight-hour shifts to ten-hour shifts.[8] Chief Tress explained that each officer would still work forty hours per week, or eighty hours per pay period. The memorandum also explained that the new schedule cycle would run for 49 days (7 weeks) and that, out of the 49 days, an officer would work for 28 days and be off for 21 days. The change was made pursuant to Article 6, Section 5 of the MOU, which provides that work schedules may be changed by the University at its discretion as needed upon fourteen days' notice. The memorandum did not mention any adjustment concerning holiday leave or any other form of leave. It is undisputed that the University had the right to make the schedule change; what is at issue is whether the University was required to

_____

[8]According to testimony at the hearing before the ALJ, the University made the schedule change to address officer safety, crime trends, and calls for service.

increase the hours allotted for holiday leave.

In a letter to Chief Tress dated January 25, 2018 (after the schedule change went into effect), on behalf of himself and all other members of the Union, Merryman submitted a Step 1 Grievance pursuant to Article 11 of the MOU. Merryman stated that the University had violated Article 15 of the MOU by failing to credit employees with the appropriate amount of holiday leave. Merryman indicated that, by moving employees from eight-hour shifts to ten-hour shifts, the University had redefined a "workday" as ten hours. Merryman argued that, because the University had exercised its prerogative to increase an employee's workday from eight hours to ten hours, the University was obligated to credit all holidays and any makeup dates at a rate of ten hours per holiday.[9] On behalf of the Union, Merryman requested that the University acknowledge, among other things, that a holiday is defined as ten hours and that any officer who worked on a prescheduled holiday was entitled to ten hours of holiday leave.

In a letter to Merryman dated February 7, 2018, at Step 1 of the Grievance procedure, Chad R. Ellis, the Acting Chief of Police, responded that, after consideration, it

---

[9]Merryman explained that, as a result of the transition to ten-hour shifts, if an employee was off on a prescheduled holiday, the employee should be granted ten hours of holiday leave. But, under the schedule change, if an employee worked ten hours on a prescheduled holiday and was granted a makeup holiday pursuant to Article 15, the employee would be granted only eight hours of holiday leave, and would be required to use up to two hours of another type of leave to be entitled to a day off to make up for the worked holiday. Or if an employee wanted to be off on a scheduled holiday, the employee would be granted only eight hours of holiday leave and would be required to use two hours of another type of leave to have the entire holiday off. Merryman contended that this outcome was illogical, and that holidays should be credited the same number of hours as workdays for all employees.

- 13 -

had been determined that the Union's complaint about holiday leave pertained to fringe benefits and staffing, and thus was not a grievable issue under the MOU.

In a letter to Mary L. Maher, the Assistant Vice President of Human Resources of the University, dated February 9, 2018, on behalf of himself and all other members of the Union, Merryman submitted a Step 2 Grievance. In addition to repeating the contentions that he made in his January 25, 2018 letter to Chief Tress, Merryman argued that the dispute was a grievable issue under the grievance procedure set forth in Article 11 of the MOU. Specifically, Merryman asserted that Article 11 indicated that the University and the Union agreed to make any disputes regarding the interpretation or application of the MOU subject to the grievance procedure. Merryman maintained that ED §§ 13-201 to 13-207 merely set forth the procedural requirements for presenting a grievance and did not prohibit "grieving issues regarding the interpretation of the MOU."

In a letter to Merryman dated March 5, 2018, Beth Amyot, Chief Finance Officer and Vice President for Administration & Finance of the University, responded that, per Article 11 of the MOU and ED § 13-201(c), the dispute about holiday leave was not a grievable issue because holiday leave is a fringe benefit. Amyot stated that the University could not "increase the maximum holiday hour accrual authorized by [the University System of Maryland] and the Board of Regents, and as outlined" by the University's Human Resource website.[10]

---

[10]Amyot noted, though, that, in response to recordkeeping issues associated with the change to ten-hour shifts, the University would be modifying its recordkeeping procedures as to leave.

**Proceedings before the ALJ**

On March 15, 2018, the Union filed a Step 3 Grievance with the Office of Administrative Hearings, requesting a hearing before an ALJ.

On April 23, 2018, the University filed with the ALJ a motion to dismiss, arguing that the complaint about holiday leave was not a grievable issue because it pertained to fringe benefits and that, as such, the complaint must be dismissed. The ALJ conducted a hearing on the motion to dismiss. At the hearing, the University's counsel contended that the complaint about holiday leave was a complaint about the level of fringe benefits. Among other things, the University's counsel maintained that the amount of fringe benefits in the form of holiday leave is set by the University System of Maryland policy, namely, Policy VII-7.30, and that, if the ALJ were to decide the dispute in the Union's favor, it would be changing a policy set by the University System of Maryland. The University's counsel acknowledged that Policy VII-7.30 addresses holiday leave in terms of days, not hours, but stated that police officers, as State employees, are aware that leave is accrued in hours. The University's counsel contended that the Union sought to have the ALJ grant its members something (an increase in holiday leave) that the policy does not allow other nonexempt employees.[11]

The University's counsel also argued that the change in work schedule did not affect the total number of hours that officers work in a year—forty hours per week or 2,080 hours per year—and that, as such, the change in work schedule did not change the amount of any

---

[11]According to Maher's testimony before the ALJ at the evidentiary hearing, nonexempt employees are eligible for overtime pay.

form of leave, including the eighty-eight hours of holiday leave. The University's counsel pointed out that the schedule change did not change the amount of any type of leave—sick leave, annual leave, personal leave, or holiday leave.

By contrast, the Union's counsel contended that the complaint about holiday leave concerned a disagreement about the interpretation of the MOU and Policy VII-7.30, not a dispute about the general level of benefits, and, as such, presented a grievable issue. The Union's counsel argued that a holiday consists of a complete day that an employee has to take off and although an employee accrues "holidays in hours, [] they should accrue it based on their shift scheduled[.]" According to the Union's counsel, the Union was not asking for more holidays as the Union was not seeking an increase from eleven holidays to, for example, thirteen holidays. The Union's counsel reasoned that the disagreement concerned "what a holiday is" and that if a workday is ten hours rather than eight hours and officers are receiving eighty-eight hours of holiday leave, then the officers are "now only getting 8.8 days of holiday leave, which is a decrease[.]"

On June 7, 2018, the ALJ issued a written ruling denying the motion to dismiss. In agreement with the Union's counsel, the ALJ determined that the issue raised by the Union was "an issue of contract interpretation," and was "included in the definition of [a] grievance cited by the University and used in Article 11 of the MOU."

On July 16, 2018, the ALJ conducted an evidentiary hearing on the merits. During opening statements, the Union's counsel recognized that the University had the right to make the schedule change, but argued that a holiday is a day off, and that a holiday should equate to a workday, which had been changed to ten hours. The University's counsel

contended that the change in the work schedule neither changed the number of hours officers were required to work nor changed the nature of the amount of fringe benefits that officers received. The University's counsel argued that, like other nonexempt employees of the University, officers continued to receive eighty-eight hours of holiday leave in a non-election year. The University's counsel asserted that the Union sought to have holiday leave increased to 110 hours, which would be a departure from the University System of Maryland's policy and would require approval from the Board of Regents.

As the sole witness for the Union, among other things, Merryman testified that, after the schedule change but before the Step 2 Grievance decision, a holiday had to be taken in an eight-hour increment and officers "had to find additional two hours somewhere to use." After the Step 2 Grievance decision, holiday leave was placed into a leave bank and "could be used in any increments [an officer] wanted: two, three hours, ten hours, whatever you decided to take, eight hours." Merryman testified that the change did not alleviate his concern because, after using eighty-eight hours of holiday leave, officers still needed to use additional hours from other forms of leave "for the ten-hour days to get 110 hours." Merryman testified that, in the Union's view, a holiday is a ten-hour day because it is equivalent to a workday. On cross-examination, Merryman acknowledged that both before and after the schedule change, officers received eighty-eight hours of holiday leave and agreed that the Union was essentially asking the University to give officers ten hours of holiday leave for each of the eleven holidays granted to them. When asked, Merryman acknowledged that other nonexempt employees do not get 110 hours of holiday leave per year.

As a witness for the University, Chief Ellis, then the Chief of Police, testified that both before and after the schedule change officers worked forty hours per week and 2,080 hours per year. Chief Ellis testified that the schedule change did not affect the amount of holiday leave that officers receive, which is eighty-eight hours of holiday leave. Chief Ellis explained that leave has always accrued and been measured in terms of hours and that an officer's time sheet reflects how many hours of each type of leave the officer has accrued at any given time. Chief Ellis testified that, after the schedule change, upon discussions with Human Resources and Merryman, holiday leave had been placed in a leave bank to be used in hourly increments. When asked what an officer would put on a time sheet if the officer was taking, for example, the Fourth of July off on July 10th, Chief Ellis responded that it would depend on what leave the officer has in the officer's leave bank: "If the officer has ten hours of holiday leave, he can . . . surely put ten hours of holiday leave. If they have ten hours of annual [leave], they could do that. If they only had four hours of holiday . . . then they need to complement it with the other six, that's what they would do." On redirect examination, Chief Ellis testified that the schedule change only amounted to less time of holiday leave if a holiday was defined in terms of days, not hours, but he reiterated that leave has always accrued and been measured in hours.

As a witness for the University, Maher, formerly the Assistant Vice President and Chief Human Resources Officer for the University and then Special Assistant to the Chief Financial Officer, testified like Chief Ellis, that before and after the schedule change officers worked forty hours a week or 2,080 hours per year. Maher testified that both before and after the schedule change the various types of leave continued to be accrued in

the same amount per year, for example: eighty-eight hours of sick leave, which accrued at the rate of 4.61 hours biweekly and could be taken in increments of thirty minutes; eighty-eight hours of annual leave (increasing by eight hours with each year of service), which could be taken in increments of thirty minutes; twenty-four hours of personal leave, which could be taken in increments of thirty minutes; and eighty-eight hours of holiday leave, plus twenty-four hours of administrative-holiday leave, in a non-election year. Maher, too, testified that officers could now take holiday leave in increments from thirty minutes up to ten hours in a shift. Maher confirmed that time sheets have always reflected the accrual of leave on an hourly basis, as opposed to a day. Maher testified that the University System of Maryland also has leave policies "that are more general" that the University is required "to be aligned with[.]"

Maher testified that, if the officers were to receive ten hours of holiday leave for each of the eleven designated holidays, the result would be an increase of twenty-two hours of holiday leave or 110 hours of holiday leave instead of eighty-eight hours. Maher testified that the twenty-two-hour difference "would be a fringe benefit impact" and the University would need "to redefine their fringe benefits to be inclusive of more holiday leave." Maher explained:

> Typically, through that process, we would need to -- obviously, there's a financial increase, benefit cost increase, or fringe benefit cost increase for the university per officer, but we would also need to get support from [the University System of Maryland] and [] approval from the Board of Regents and support from the State Attorney General's Office. . . . Because the [University System of Maryland] policy, although it's not spoken in hours, it refers to a holiday in the traditional sense of eight hours, plus the 88-hour increments that institutions have to award their workforce.
> And so it would require our getting their support and approval from

the Board of Regents because it would increase the cost to the institution, and then it would provide a different fringe-benefit program for a subset of employees than any other employee in that institution.

Maher testified that no other nonexempt employee at the University receives 110 hours of holiday leave.

Maher acknowledged that Policy VII-7.30, which is binding on the University, does not define the number of hours in a holiday and instead "refers to earning 11 holidays and/or 12 holidays, . . . but there's nothing that speaks specifically to eight hours." On cross-examination, Maher again described the impact of eighty-eight hours of holiday leave versus 110 hours of holiday leave as an increase of twenty-two additional hours and testified that the University would need "preapproval from the Board of Regents." Maher reiterated that the University would need "to get university system approval if there's additional costs[.]"

In closing argument, the Union's counsel contended that University policy does not define holidays in terms of hours and instead provides for eleven holidays per year. The Union's counsel requested that the ALJ award two hours of holiday leave for any days that officers were required to use other leave "to fill the gap between eight and ten hours." By contrast, the University's counsel asserted that the MOU did not define a holiday as the same number of hours in a work shift and that time sheets had always shown that leave was accrued and taken in hours. The University's counsel maintained that if there were to be a deviation from the standard policy of eighty-eight holiday leave hours, there would need to be "a series of approvals" that could not "be done in a grievance proceeding because it will be contrary to [University System of Maryland] policies."

On October 15, 2018, the ALJ issued a written decision in favor of the Union. In the decision, among other things, the ALJ reasoned:

> The University argued the change would increase the number of annual holidays and increase a fringe benefit. The reasoning provided is illogical since the MOU permits contract changes to foundational terms such as workday. Further, the [Union is] not requesting an additional holiday beyond what is already provided by the [University System of Maryland]. The [Union] simply request[s] the same allocation previously provided – eight hours meant eight hours, including for holiday leave allocation. In light of the new schedule, the [Union] argue[s] ten hours should mean ten hours, including the holiday leave allocation, and not anything less. To require the [Union] to supplement holiday leave with additional leave to equal ten hours is in contrast to the signed MOU[.] . . . Under the MOU, when an officer works on a prescheduled holiday the officer should be receive ten hours of pay, if a regular workday is now defined by the change in contract terms as ten consecutive hours. Per the MOU, the definition of workday and the meaning of regular straight time now means ten hours instead of eight hours.

The ALJ concluded "as a matter of law" that the University changed the definition of a workday to ten hours and that the change applied "to the allocation of holiday leave[.]" The ALJ determined that the change applied to the application and accrual of holiday leave for officers who used holiday leave or who worked on a prescheduled holiday after the schedule change. The ALJ ordered: (1) that the University define a workday for sworn police officers as ten hours; (2) that the parties work to determine the officers affected by the schedule change and to determine the number of non-holiday leave hours used by the officers; and (3) that, once the parties determined the non-holiday leave hours used, the University "credit the applicable hours to the affected officers."

**Proceedings in the Circuit Court**

On November 14, 2018, the University filed in the circuit court a petition for judicial review. On April 25, 2019, the circuit court conducted a hearing. At the conclusion of the

- 21 -

hearing, the circuit court ruled from the bench, concluding that Article 11 of the MOU, which authorized the right to file a grievance in the event of an alleged violation or disagreement over any provision of the MOU, placed the dispute outside of the fringe benefit clause and made it proper for the ALJ to hear the dispute about holiday leave. As to the merits of the dispute, the circuit court ruled that the police department had the authority to make the schedule changes, but ruled in favor of the Union, stating "that the [MOU] says that a day is a day is a day." The circuit court stated that the only remaining matter was whether it had the authority to grant additional hours of holiday leave—*i.e.*, whether it had the authority to grant the Union the relief that it requested—or whether only the Board of Regents had the power to do so. The circuit court indicated that it would issue its ruling on that matter after additional research.

On May 2, 2019, the circuit court issued an order affirming in part and reversing in part the ALJ's decision. In the order, the circuit court affirmed the ALJ's decision with respect to the conclusion that the University unilaterally changed the definition of "workday" to ten hours, and that the change affected the allocation of holiday leave for the officers. The circuit court reversed the ALJ's decision with respect to all other determinations. The circuit court found that, pursuant to ED § 12-105, the Board of Regents had "the sole authority to propose budgetary changes" that affect the University and that neither it nor the ALJ could "issue an order that ha[d] the effect of increasing the budget of the University System."

On May 29, 2019, the Union noted an appeal.

On May 5, 2020, in an unreported opinion, the Court of Special Appeals vacated the circuit court's judgment and remanded the case to the circuit court with instruction to remand to the ALJ to dismiss the grievance proceeding. See Keith Merryman and Fraternal Order of Police Lodge 146 v. University of Baltimore, No. 649, Sept. Term, 2019, 2020 WL 2128840 (Md. Ct. Spec. App. May 5, 2020). On May 28, 2020, the University moved to have the opinion reported. On July 13, 2020, the Court of Special Appeals issued a reported opinion. See Merryman, 246 Md. App. 544, 231 A.3d 498.

The Court of Special Appeals held that the ALJ lacked the authority to make any findings of fact or conclusions of law because the ALJ lacked jurisdiction over the dispute regarding holiday leave. See id. at 560, 231 A.3d at 508. The Court of Special Appeals rejected the Union's contention that, although the dispute did not meet ED § 13-201's definition of "grievance," other language in the MOU expanded the scope of grievances to include the dispute about holiday leave. See id. at 556, 559, 231 A.3d at 505, 507. According to the Court of Special Appeals, the Union's argument "centered on its belief that the parties could and did confer jurisdiction upon the [ALJ] by expanding the scope of grievances subject to the statutory procedures incorporated into the parties' agreement." Id. at 559, 231 A.3d at 507. The Court of Special Appeals rejected that argument, explaining:

> The scope of the dispute-resolution mechanism provided for in the [MOU] between [the Union] and the University was fixed by the General Assembly. [The Union]'s suggestion that the parties' memorandum effectively "amended" Educ. § 13-201(c) to expand the scope of issues grievable under the Educ. § 13-203 procedure is conceptually untenable. It

is "widely acknowledged" that "parties cannot confer jurisdiction, in its fundamental sense, upon a court by consent." *Stewart v. State*, 287 Md. 524, 527–28, 413 A.2d 1337 (1980); *see also State v. Walls*, 90 Md. App. 300, 305, 600 A.2d 1165 (1992) ("Jurisdiction over the subject matter cannot be conferred by consent of the parties ...."). For the same fundamental reasons, it seems clear that parties cannot expand the jurisdiction of an administrative agency by contract. We have no reason to believe that the legislature intended that a state college or university could modify by contract the limits imposed upon the grievance process by Educ. § 13-201(c). If the General Assembly had intended to make these statutorily prescribed limits a mere default, it could have said so.

Merryman, 246 Md. App. at 559, 231 A.3d at 507-08 (ellipses in original).

The Court of Special Appeals observed that, even if the parties could, by agreement, expand the jurisdiction given by the General Assembly to the ALJ, the Union agreed that it could not grieve a complaint about the general level of fringe benefits, as set forth in ED § 13-201(c). See id. at 560, 231 A.3d at 508. The Court of Special Appeals determined that, "[c]learly, a dispute about the number of holiday-leave hours to which University police are entitled 'pertains to the general level of . . . fringe benefits' provided to the officers." Id. at 560, 231 A.3d at 508 (ellipsis in original). The Court of Special Appeals was unpersuaded by the Union's "attempt to recast the dispute—stressing that the officers seek only 'to determine how many hours are in a holiday[.]'" Id. at 560, 231 A.3d at 508. The Court of Special Appeals explained:

> What [the Union] sought—and what the [ALJ] ultimately awarded—was that University police officers would receive twenty-two more hours of annual paid holiday leave than the University currently awards employees. To repurpose a phrase from Justice Elena Kagan, "[i]f that does not count as ['pertain[ing] to the general level of . . . fringe benefits,'] we are hard pressed to know what would." *Chaidez v. United States*, 568 U.S. 342, 353, 133 S.Ct. 1103, 185 L.Ed.2d 149 (2013).

Merryman, 246 Md. App. at 560, 231 A.3d at 508 (some alterations in original). Because

- 24 -

the Court of Special Appeals held that the ALJ lacked jurisdiction to adjudicate the dispute, the Court did not address the merits of the ALJ's decision or the propriety of the remedy that the ALJ ordered. See id. at 560, 231 A.3d at 508.

## Petition for a Writ of *Certiorari*

On August 28, 2020, the Union petitioned for a writ of *certiorari*, raising the following two issues:

1.  Does the Office of Administrative Hearings have jurisdiction when the parties have contractually agreed to submit grievances regarding the interpretation of their collective bargaining agreement to the Office for adjudication?

2.  Did the Court err in finding that because the remedy would involve awarding additional leave hours, the grievance constituted a complaint pertaining to the "general level of fringe benefits" prohibited by ED § 13-201(c)?

On October 6, 2020, this Court granted the petition. See Merryman, 471 Md. 101, 240 A.3d 852.

## DISCUSSION[12]

## The Parties' Contentions

Before this Court, the Union and the University repeat the arguments made before the ALJ, in the circuit court, and before the Court of Special Appeals. The Union argues that it did not seek to dispute the general level of fringe benefits, but rather challenged the University's interpretation of the number of hours in a holiday, which is a dispute about the terms of the contract. The Union acknowledges that "there is no dispute that holiday

---

[12]Although the Union raised two issues in the petition for a writ of *certiorari*, we address the issues together.

leave is a term and condition of employment and a fringe benefit subject to the collective bargaining process." (Cleaned up). The Union argues, though, that, rather than seeking an increase in holiday leave, it has alleged that, under the MOU, the number of hours in a holiday should be the same as the number of hours in a workday.

The University responds that the complaint brought by the Union is prohibited because it is a dispute concerning the general level of fringe benefits to which members of the Union are entitled. The University argues that it is undisputed that if the ALJ's decision is affirmed, the result is an increase in paid holiday leave, *i.e.*, that "the general level of holiday leave hours, a fringe benefit, would be increased for every officer." The University maintains that the Union's characterization of the complaint as one involving a contractual dispute concerning the meaning of the term "holiday" does not alter the circumstance that the complaint is a dispute about the general level of fringe benefits.

### Standard of Review

On appeal of a judgment rendered on judicial review of a decision of an administrative agency, this Court "review[s] directly the action of the agency, rather than the decision of the intervening reviewing courts." Md. Ins. Comm'r v. Central Acceptance Corp., 424 Md. 1, 14, 33 A.3d 949, 957 (2011) (citation omitted). "This Court reviews an administrative agency's decision under the same statutory standards as the [c]ircuit [c]ourt." Motor Vehicle Admin. v. Barrett, 467 Md. 61, 68, 223 A.3d 589, 594 (2020) (cleaned up). "It is not this Court's role to substitute its judgment for the expertise of those persons who constitute the administrative agency." Id. at 69, 223 A.3d at 594 (cleaned up).

Ordinarily, "the court reviewing a final decision of an administrative agency shall

determine (1) the legality of the decision and (2) whether there was substantial evidence from the record as a whole to support the decision." Id. at 69, 223 A.3d at 594 (cleaned up). This Court reviews an agency's legal conclusions without deference "for correctness." Schwartz v. Md. Dep't of Nat. Res., 385 Md. 534, 554, 870 A.2d 168, 180 (2005) (citation omitted). We have stated, though, that "[t]he legal conclusions of an administrative agency that are premised upon an interpretation of the statutes that the agency administers are afforded great weight." Gore Enterprise Holdings, Inc. v. Comptroller of Treasury, 437 Md. 492, 505, 87 A.3d 1263, 1270 (2014) (cleaned up).

**Analysis**

Here, we hold that, under Article 11 of the MOU, which incorporates the grievance procedures set forth in ED §§ 13-201 to 13-207, including the definition of a "grievance" set forth in ED § 13-201(c), the complaint brought by the Union concerning holiday leave does not present a grievable issue because it is a dispute that "pertains to the general level of . . . fringe benefits, or to other broad areas of financial management and staffing[.]" Holiday leave is a fringe benefit and the complaint concerning the number of hours of holiday leave to which officers are entitled—which essentially requested that each officer receive an additional twenty-two hours of holiday leave per year—is a complaint pertaining to the general level of fringe benefits provided to officers and as such is not a grievable issue. We affirm the judgment of the Court of Special Appeals—which remanded the case to the ALJ to dismiss the grievance proceeding—albeit for a slightly different reason.

As an initial matter, we note that the issues in this case are not issues of jurisdiction in a traditional sense. See, e.g., Kent Island, LLC v. DiNapoli, 430 Md. 348, 362-63, 61

A.3d 21, 29 (2013) ("Jurisdiction embraces two distinct concepts: (i) the power of a court to render a valid decree, and (ii) the propriety of granting the relief sought. Whether a court has fundamental jurisdiction, or the power, or authority, to render a valid final judgment, is determined by the applicable constitutional and statutory provisions." (Cleaned up)). At issue in this case is whether the dispute about holiday leave constituted a grievable issue under the MOU and the statutory grievance procedures, which were incorporated into the MOU. Although the first question raised in the petition for a writ of *certiorari* is phrased in terms of whether the Office of Administration Hearings had jurisdiction over the complaint and the Court of Special Appeals held that the ALJ lacked jurisdiction over the dispute, the question is really whether the complaint about holiday leave constituted a grievable issue. The short answer to that question is no—the complaint about holiday leave does not constitute a grievable issue, as we explain.

With respect to grievances between employees and the University, ED § 13-203(d), which outlines the Step Three grievance procedure, expressly provides that an aggrieved employee may submit a grievance either to arbitration or to the Chancellor, who can "delegate this responsibility to the Office of Administrative Hearings in accordance with Title 10, Subtitle 2 of the State Government Article." In other words, ED § 13-203(d) provides an ALJ with jurisdiction to hear a grievance at Step Three. The power or authority, *i.e.*, jurisdiction, of an ALJ to hear a grievance is different from the question of whether a dispute involves a grievable issue under ED § 13-201(c). As part of the ALJ's authority to hear a dispute that has gone through Step One and Step Two of the grievance process and reached Step Three, upon review, an ALJ has the authority to determine

whether or not the dispute in fact involves a grievable issue and, if not, dismiss the complaint.

On a different matter, it is worth noting that the definition of "grievance" set forth in ED § 13-201(c) is expressly adopted and incorporated into the MOU, *i.e.*, the definition of "grievance" is the same under both the statute and the MOU.  ED § 13-201(c) defines a "grievance" as "any cause of complaint arising between a classified employee or associate staff employee and his employer on a matter concerning discipline, alleged discrimination, promotion, assignment, or interpretation or application of University rules or departmental procedures over which the University management has control."  ED § 13-201(c) also provides that, "if the complaint pertains to the general level of wages, wage patterns, fringe benefits, or to other broad areas of financial management and staffing, it is not a grievable issue."  In the MOU, the parties did not create a new definition of "grievance" or purport to otherwise depart from the statutory grievance procedure that excludes issues related to the general level of fringe benefits and broad area of financial management as not grievable.  As such, a complaint may well involve a dispute that arises between an employee and the University on a matter concerning discipline, alleged discrimination, promotion, and the like, but may nonetheless possibly be excluded because the complaint involves, for example, the general level of fringe benefits or other broad area of financial management.

Herein, we address primarily the exclusionary language contained in ED § 13-201(c), namely, that a complaint "is not a grievable issue" subject to the grievance procedure "if the complaint pertains to the general level of . . . fringe benefits, or to other

broad areas of financial management and staffing[.]" In this case, the question is what constitutes a fringe benefit. Neither the MOU nor ED §§ 13-201 to 13-207 specifically define the term fringe benefit. Black's Law Dictionary, though, defines a "fringe benefit" as "[a] benefit (other than direct salary or compensation) received by an employee from an employer, such as insurance, a company car, or a tuition allowance." *Fringe Benefit*, Black's Law Dictionary (11th ed. 2019). Similarly, Merriam-Webster defines a "fringe benefit," in pertinent part, as "an employment benefit (such as a pension or a paid holiday) granted by an employer that has a monetary value but does not affect basic wage rates[.]" *Fringe Benefit*, Merriam-Webster (2021), <u>available at</u> https://www.merriam-webster.com/ dictionary/fringe%20benefit [https://perma.cc/HX6R-338S]. It is clear that holiday leave is a fringe benefit because it is a benefit, other than wages, received by an employee from an employer. Indeed, even the Union acknowledges this basic premise, stating on brief in this Court that "there is no dispute that holiday leave is a term and condition of employment and a fringe benefit subject to the collective bargaining process." (Cleaned up).

Although the Union acknowledges that holiday leave is a fringe benefit, the Union nonetheless contends that it is not challenging the general level of fringe benefits accorded police officers but rather is engaged in a contractual dispute about the interpretation of the terms of the MOU. The very substance of the Union's complaint, though, demonstrates that it is a complaint about the general level of fringe benefits provided to its members. According to the Union, after the schedule change, the University did not credit officers "with the appropriate amount of holiday leave" and the Union sought to have a workday (and by extension, a holiday) defined as ten hours. In essence, the Union sought twenty-

- 30 -

two additional hours of holiday leave per year for all officers (from eighty-eight hours of holiday leave to 110 hours), *i.e.*, an increase in the general level of a fringe benefit. We are not persuaded by the Union's characterization of the dispute as seeking only to determine how many hours are in a holiday and not seeking to challenge the general level of fringe benefits. It is plain that what the Union sought, and what the ALJ actually awarded, was an increase in the number of hours of paid holiday leave that officers receive annually—not merely a determination as to the number of hours in a holiday or the number of hours in a workday.

More specifically, to the extent that the Union contends that its complaint concerned days, not hours, and that crediting holidays at the same rate as workdays is the relief requested, this is undoubtedly a request for an increase in the amount of paid holiday leave per year across the board for all officers—an increase of twenty-two additional hours per year per officer. To be sure, Section 1 of Article 15 of the MOU states that officers are eligible to earn eleven holidays per year, or twelve holidays during a general or congressional election year. Policy VII-7.30 provides the same. In other words, it is accurate that a holiday in the MOU and Policy VII-7.30 is referred to as a day, and not in hours. And, we are aware that the Union has contended that in order to take a holiday off, an officer may be required to supplement holiday leave time with some other form of leave time to take a full ten hours off and that at some point after exhausting the eighty-eight hours of holiday leave an officer will be required to use some other form of leave. Nevertheless, at bottom, what the Union sought—to have a holiday defined as consisting of ten hours—would have had the effect of increasing holiday leave by an additional

twenty-two hours per year for all officers of the Union. Unless the number of hours an officer was required to work or the hours allotted to other types of leave were reduced (and they were not), this change would have increased the number of paid hours per year over the 2,080 paid hours that currently exist and would have affected the general level of fringe benefits provided to the officers and, indeed, would have resulted in increased cost to the University and the University System of Maryland.[13]

Just as the schedule change did not result in a decrease in the number of hours an officer is required to work a year, it also did not result in an increase in the number of hours an officer is required to work in a year, which is a circumstance that may have supported an argument that increasing the number of holiday leave hours was equitable. Even under this potential scenario, though, the Union's request would still have been a request for an increase in the general level of a fringe benefit. But this is not what occurred; the officers were not required to work additional hours under the schedule change. Instead, due to the schedule change, officers now have an additional fifty-two days off per year—they work four ten-hour shifts per week rather than five eight-hour shifts and now have the opportunity for three days off per week.

We are wholly unpersuaded by the Union's contention that the complaint involved

---

[13]By seeking an increase of holiday leave hours annually for the officers, the complaint obviously concerned an area of financial management, as it involved increasing paid time off for all officers and would likely have implicated adjustments involving the budget and financial management of the University. Under ED § 13-201(c) and the MOU, a complaint pertaining to either "the general level of . . . fringe benefits, or to other areas of financial management and staffing[]" is not a grievable issue.

a contract dispute and that a dispute about the interpretation of a provision of the MOU is grievable regardless of whether it concerns the general level of fringe benefits. Casting the complaint as one involving a contractual dispute concerning the interpretation of the terms "workday" and "holiday" does not change the circumstance that the substance of the complaint seeks an increase in holiday leave hours for all officers and as such concerns the general level of fringe benefits and is excluded under ED § 13-201(c) as not a grievable issue. From our perspective, although Article 11 of the MOU provides that "[i]n the event of an alleged violation or disagreement over any of the provisions of this MOU," officers "shall have the right to file a grievance in accordance with" ED §§ 13-201 to 13-207, this general language would not supersede the definition of what constitutes a grievance under ED § 13-201(c), which is expressly incorporated into the MOU. To hold as the Union urges would be to permit a party to bring a complaint about the general level of fringe benefits, yet avoid the applicability of the exclusionary language in ED § 13-201(c) and in this case the MOU, by simply alleging that the complaint is really a contract interpretation dispute. This would not be a logical or permissible result. Simply because a party characterizes a complaint as a dispute about an agreement's terms should not permit the party to make an end run around express statutory exclusions adopted in the agreement. To do so would render the exclusions pertaining to the general level of fringe benefits and other areas meaningless.

In addition to being expressly excluded as a grievable issue, we observe that the dispute about holiday leave raises an issue as to whether it is a complaint concerning the "interpretation or application of University rules or departmental procedures over which

the University management has control." ED § 13-201(c). We are aware that, in its opinion, the Court of Special Appeals noted:

> The University contends the reason why holiday-leave hours are a matter beyond its management's control is because the University System's board of regents establishes the number of holiday-leave hours awarded to university police. On the record before us, we cannot accept this assertion. This seemingly simple issue—whether the board or the management of member institutions determines the number of leave hours employees accrue for each holiday—does not appear to have been resolved anywhere in the three-step grievance procedure.
> In its brief, the University asserts that, at the administrative hearing, counsel for [the Union] conceded, in the University's words, "that the [University System of Maryland] board of regents sets holiday leave for the entire [University System of Maryland]." We read the record differently. As we understand the portion of the administrative law judge's decision cited by the University for support, [the Union] conceded that the board of regents determines when the guaranteed eleven holidays are observed each year. To agree that the board of regents sets *the dates on which holidays are observed* is not to agree that the board of regents sets *the number of holiday-leave hours awarded* for each holiday.

Merryman, 246 Md. App. at 558 n.6, 231 A.3d at 507 n.6 (emphasis in original). We agree with the Court of Special Appeals that the issue of whether the Board of Regents or the University determines the number of holiday leave hours does not appear to have been decided by the ALJ at Step Three of the grievance procedure.

Despite the record demonstrating that there was testimony at the evidentiary hearing concerning the necessity for approval by the Board of Regents for an increase in the number of holiday leave hours for the officers, the ALJ did not make a factual finding concerning the matter. At the evidentiary hearing before the ALJ, Chief Ellis testified that, both before and after the schedule change, officers worked forty hours per week and 2,080 hours per year. Maher testified to the same. Maher also testified that officers continued to accrue

leave in the same amount (at the same rate) as before the schedule change. What can be gleaned from this testimony is that there are 2,080 total hours (work and leave hours) set aside by the University and the Board of Regents for which all officers of the Union must be paid per year.

Maher testified that increasing holiday leave by twenty-two hours constitutes "a fringe benefit impact" for which there would be "a financial increase, benefit cost increase, or fringe benefit cost increase for the university per officer," and the University would necessarily be required to get approval from the Board of Regents (and support from the University System of Maryland and the State Attorney General's Office). Maher explained that approval from the Board of Regents would be required "because it would increase the cost to the institution, and [] would provide a different fringe-benefit program for a subset of employees than any other employee in that institution."

With Maher's uncontradicted testimony about the need for Board of Regents's approval and the financial impact of increasing the number of holiday leave hours, it seems clear that granting the Union's request for additional holiday leave hours would implicate a budgetary matter necessary for approval by the Board of Regents. But, the ALJ did not make a factual finding on this point one way or the other. On this issue, in the written decision, rather than making a factual finding, the ALJ summarized Maher's testimony, stating: "[T]he holiday leave hours increase would redefine fringe benefits and cause a financial increase that can only be changed by the [University System of Maryland] Board of Regents. However, [] Maher also testified the allocation of holiday leave hours in eight-hour increments is not a [University System of Maryland] policy." The observation by

- 35 -

Maher that the allocation of holiday leave in eight-hour increments is not a policy of the University System of Maryland does not mean that the Board's approval is not necessary to increase holiday leave hours. Rather, Maher's observation is consistent with the change that the University made at Step Two of the grievance procedure permitting the officers to use holiday leave in increments fewer or greater than eight hours. Nonetheless, in the absence of a factual finding on the matter, like the Court of Special Appeals, we will exercise restraint and not explicitly conclude that an increase in holiday leave for officers was a matter beyond the control of University management.

As a final matter, we observe that the Union appears to suggest that if we conclude that the complaint about holiday leave involves a dispute about the general level of fringe benefits and thus does not involve a grievable issue, officers will be prevented in the future from raising a grievance involving wages, hours, or benefits. The Union contends that "[a]lmost any grievance that arises out of a disagreement between the [Union] and the University about the MOU's provisions will involve wages, hours, and benefits, since these are the necessary subjects of bargaining that the MOU memorializes." The Union argues that it should be permitted to use the grievance procedure to challenge the University's interpretation of the MOU because to hold otherwise would permit the University to unilaterally interpret a contract "so long as some wage or benefit is at issue." We do not agree. Our holding in this case—that the dispute about holiday leave is not a grievable issue—does not prevent officers from raising a complaint about wages, hours, or benefits through the grievance procedure. A complaint by an officer "concerning discipline, alleged discrimination, promotion, assignment, or interpretation or application of University rules

or departmental procedures over which the University management has control" remains a "grievance" under ED § 13-201(c) and the MOU and is subject to the three-step grievance procedure. Contrary to the Union's suggestion, our holding in this case does not prohibit, for example, an employee from bringing a grievance concerning a demotion and an attendant pay decrease. Such grievances concern an employee's specific circumstances and do not "pertain[] to the general level of wages, wage patterns, fringe benefits, or to other broad areas of financial management and staffing" like a complaint seeking an across the board increase in holiday leave does.

For all of the reasons explained above, we hold that the complaint about holiday leave does not present a grievable issue under ED § 13-201(c) and the MOU. As such, we need not address the merits of the complaint. We affirm the judgment of the Court of Special Appeals, which remands the case to the ALJ for the ALJ to dismiss the grievance proceeding.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED. PETITIONERS TO PAY COSTS.**